674 So.2d 621 (1996)
Linroy BOTTOSON, Appellant,
v.
STATE of Florida, Appellee.
No. 81411.
Supreme Court of Florida.
January 18, 1996.
Rehearing Denied May 9, 1996.
*622 James M. Russ of the Law Offices of James M. Russ, P.A., Orlando; and Steven M. Goldstein, Special Counsel, Volunteer Lawyers' Resource Center, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General; and Margene A. Roper and Kenneth S. Nunnelley, Assistant Attorneys General, Daytona Beach, for Appellee.
PER CURIAM.
We have on appeal the judgment of the trial court denying Linroy Bottoson, an inmate under sentence of death, relief requested under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), (9), Fla. Const.
Briefly stated, Bottoson kidnapped a postmistress and stole some money orders. He held her captive for three days and at least part of the time confined her in the trunk of his car. He then stabbed her sixteen times and finally ran over her with his car. He admitted the murder to more than one person. The jury recommended death, and a sentence of death was imposed. Bottoson v. State, 443 So.2d 962 (Fla.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 223, 83 L.Ed.2d 153 (1984).
Most of Bottoson's claims are procedurally barred [1] or meritless.[2] However, there are three issues which require discussion.
Bottoson contends that his trial counsel was ineffective for failing to investigate the qualifications of a dog handler who testified for the State. At the time of the trial, the witness was a nationally recognized witness in dog handling, but several years later he was exposed as a charlatan who had misrepresented himself and his dog's capabilities. We agree with the trial court's finding that counsel's decision not to probe deeper into the witness's qualifications was not substandard or deficient. Moreover, even if it could be said that counsel was deficient, the evidence against Bottoson was so overwhelming that there is no reasonable probability that the result would have been different in the absence of such deficiency.[3]
Turning to the penalty phase, Bottoson contends that the jury instructions at his trial violated Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Because the trial judge only instructed the jury on the statutory mitigating factors, it is clear that a Hitchcock error did in *623 fact occur. However, the United States Supreme Court acknowledged in Hitchcock that its reasoning was subject to a harmless error analysis.
At the outset, we note that in this case the trial court permitted the presentation of nonstatutory mitigating evidence and did not expressly tell the jury not to consider such evidence. Moreover, defense counsel presented certain nonstatutory evidence. The jury was told that they could consider anything in mitigation. During closing argument in the penalty phase, the prosecuting attorney made the following remarks:
Well, let's be fair to the Defendant. There were some other things. The reason why this big blank space down here [on the jury form] is there and that is because, ladies and gentlemen, under the law, you all can bring in anything you want to by way of mitigation.
From the case in chief, that is the evidence that you all already heard, I think you heard some evidence of, in the statement that he gave to the ministers, I'm sorry that this happened, demons got on me. You've heard a lot of evidence even in this portion of the trial, the penalty phase that Mr. Bottoson holds himself out as a minister and finally, in that statement, that came out in the case in chief, ladies and gentlemen, Mr. Bottoson thinks that fourteen years of Federal time is enough and he has that on him. You may consider that in mitigation.
From the Defense's witnesses that were brought in here, ladies and gentlemen, I'm going to write these by numbers. Reverend Johnson comes in here and I think what you can boil down his testimony to be saying is one or more people in the courtroom have made mistakes.
Well, for what it's worth, you can consider that, Mrs. Johnson says that she feels Linroy Bottoson is not a sinner. You may consider that.
....
Finally, ladies and gentlemen, in mitigation, you see something you've seen, something from Mrs. Bottoson. There's a mother who loves her son and you can consider that.
Finally, the nonstatutory mitigating evidence which Bottoson presented in mitigation was not strong. A preacher and his wife testified that Bottoson had become a devout church member and assisted in counselling members of the congregation. A corrections officer testified that he had heard Bottoson counselling another prisoner. Bottoson's mother testified that he was a good son. Particularly in view of the strong aggravating circumstances,[4] we are convinced beyond a reasonable doubt that the Hitchcock error was harmless. See Demps v. Dugger, 874 F.2d 1385 (11th Cir.1989) (finding Hitchcock error harmless in view of minimal statutory mitigating evidence), cert. denied, 494 U.S. 1090, 110 S.Ct. 1834, 108 L.Ed.2d 963 (1990).
The bulk of the ten-day hearing on the motion for postconviction relief focused on Bottoson's claim that his lawyer, William Sheaffer, was ineffective during the penalty phase of his trial. The judge addressed this claim as follows:
16. Claim J, that Defendant's counsel was ineffective during the penalty phase of the trial, must also be denied. It is alleged that counsel failed to obtain Defendant's prior mental health records and failed to interview family members and friends, specifically Mr. Bottoson's mother. However, these claims are refuted by the record. Counsel attempted to obtain Defendant's past psychiatric records but was unable to obtain them prior to trial. Additionally, counsel had contacted Mr. Bottoson's mother prior to trial.

*624 The most troubling claim for this Court was Mr. Bottoson's assertion that counsel failed to present any mental disturbance evidence and certain other mitigating evidence during the penalty phase. However, Defendant's trial counsel stated that he had discussed Defendant's mental health with two or three psychiatrists who had taken a complete past medical history. Counsel averred that he did not receive any information which would have indicated past mental illness or present mental illness that could either serve as a defense or a mitigating factor in the penalty phase. Additionally, to present this type of evidence to the jury would have been incongruous with the defense asserted, i.e. Defendant had not committed the crime. During the penalty phase argument, counsel again pointed out to the jury the possibility that someone else had committed the crime. Certainly this was a valid strategy.
In any event, this Court has extensively reviewed this claim in light of the entire record, and finds that even if counsel's performance may have been deficient in some respects, any failure was not prejudicial pursuant to Strickland, 466 U.S. at 668 [104 S.Ct. at 2052, 80 L.Ed.2d at 674]. The mitigating evidence now presented would not outweigh or overcome the aggravating circumstances of this murder. Defendant's background, child experiences (Defendant was 41 years old at the time of trial) and religious eccentricities do not compare to the aggravating factors that 1) Mr. Bottoson had been previously convicted of a felony, 2) the murder occurred during the commission of a felony, 3) the murder was committed to avoid arrest, and that 4) the murder was especially heinous because of the kidnapping, long confinement and mode of killing of the 74 year old victim. See generally Buenoano v. Dugger, 559 So.2d 1116 (Fla.1990). Hence, there is no finding of prejudice under Strickland.

The record of the postconviction hearing reflects that Bottoson told Sheaffer that he had been treated for depression in Ohio and in connection with his prior robbery conviction in California. Sheaffer asked his investigator to try to obtain the Ohio medical records. The investigator contacted the applicable Ohio hospital but was advised that the records were unavailable because they had been destroyed in a fire. Sheaffer said he took no action on the California treatment because Bottoson had minimized the episode.
The postconviction record further shows that Sheaffer had no personal reservations concerning Bottoson's mental health, but in order to be certain he had him examined by two psychiatrists. Although these were competency examinations, the psychiatrists' reports necessarily discussed all aspects of Bottoson's mental health. After reviewing these reports and talking with one of the psychiatrists, Dr. Kirkland, Sheaffer concluded that the presentation of mental health testimony would not be helpful to Bottoson.
In addition, Sheaffer talked to Bottoson about witnesses who might be called in the penalty phase. Bottoson suggested two ministers and a person from the jail, but said there were no others whom he wanted to speak on his behalf. Sheaffer called Bottoson's minister as well as the minister's wife, and they both testified as to Bottoson's good character. Sheaffer also called Bottoson's mother to testify that he had been a good son and to plead for mercy.
Dr. Kirkland, who also testified at the postconviction hearing, said that Bottoson had told him of the psychiatric treatments he had received in Ohio and California. He was aware that Bottoson had experienced religious hallucinations, but observed that psychiatrists are loath to say that this would indicate that a person is abnormal or mentally ill. Dr. Kirkland was then shown a card reflecting Bottoson's medical diagnosis in Ohio, obtained by the Capital Collateral Representative's investigator from another hospital to which Bottoson's records had been transferred. The card referred to a 1962 diagnosis of acute schizophrenic episode with the words "discharge, improved." Dr. Kirkland testified that in 1962 this referred to a person who had had a short psychotic episode from which he had recovered. He said that had he been provided with that document he would not have changed his original *625 evaluation. Dr. Kirkland said that the information on the card together with the medical reports which the Capital Collateral Representative was able to obtain from California would have led him to conclude that Bottoson was a latent schizophrenic. He explained that this was a term used to describe a schizophrenic who had gotten better.
In view of Sheaffer's effort to obtain the Ohio hospital records, it is difficult to fault him for not obtaining them when his investigator could not find them. The only real shortcoming in Sheaffer's investigation to which Bottoson can point is his decision not to pursue the California medical records. Yet, even with the benefit of both the Ohio and California records, Dr. Kirkland did not indicate that he would have testified that any statutory mental mitigators were present. While the Capital Collateral Representative's psychiatrist, Dr. Phillips, who examined Bottoson eleven years after the murder, testified that both of the statutory mental mitigators were present at the time of the crime, the trial judge was entitled to discount his opinion.
In Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the United States Supreme Court explained that in order to maintain an ineffective assistance of counsel claim, the defendant has the burden of satisfying a two-prong test:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
The evidence presented below was conflicting. However, there was competent, substantial evidence to support the judge's findings and conclusions. Even if we assume some deficient performance on the part of Sheaffer, we cannot say that the evidence raises a reasonable probability that the result would have been different if Sheaffer had introduced mental health testimony or called witnesses to describe this forty-one-year-old man's troubled childhood.
We affirm the denial of Bottoson's motion for postconviction relief.
It is so ordered.
GRIMES, C.J., and OVERTON, HARDING and WELLS, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion, with which SHAW and ANSTEAD, JJ., concur.
KOGAN, Justice, concurring in part, dissenting in part.
In the context of the penalty phase, the test for ineffectiveness is that the appellant "must demonstrate that but for counsel's errors he would have probably received a life sentence." Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995) (citing Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. Such a demonstration is made if "counsel's errors deprived [Bottoson] of a reliable penalty phase proceeding." Hildwin, 654 So.2d at 110 (emphasis added). And on this question, the failure to present available mitigating evidence is a relevant concern along with the reasons for not doing so. Id. at 109-10. I accordingly turn to the record both on direct appeal and in the 3.850 proceedings below.
At the very outset of the penalty phase, Bottoson's counsel candidly admitted to the trial court that he felt himself incompetent to proceed further. While a court is not necessarily bound by such observations,[5] I believe we nevertheless must consider any factual *626 matters that may provide support for counsel's opinion. On this point, the following colloquy took place in the penalty phase:
THE COURT: ... Well, let me ask you this, without Johnson, what witnesses do you have?
MR. SHEAFFER: Zip. Zero. None.
....
I just, what I can't quite understand is, if he were a man of means and weren't forced towell, not forced to, if he, if circumstances were not such that he was required to have a Court appointed lawyer and the county paying his costs and fees, I could effectively get anyone from anywhere in the United States to come and speak in his behalf. Now, I can't and it all boils down to the fact that the county, the State, the legislature has placed restrictions on my ability to conduct a meaningful Defense on behalf of Mr. Bottoson. I'm not saying that this Court has any hand in this whatsoever; only interpreting the Statute and the Court has been most generous in allowing me investigative tools in this case within the purview of what the Statute allows, but the State of Florida has effectively at this juncture prevented me from effectively representing Mr. Bottoson on the penalty phase of this trial and it all boils down to economics.
The statute mentioned by Mr. Sheaffer was section 925.036(4), Florida Statutes (1980), which rigidly capped his fee at a total of $2,500.00 for the 191.2 hours he spent on the case. As a result, he was paid about $13.00 an hour; and the rigid cap necessarily meant that his hourly fee would decline with each additional hour of work.
Contemporaneously with Bottoson's trial, this Court had held the fee-cap to be both proper and a mandatory limit, Metropolitan Dade County v. Bridges, 402 So.2d 411 (Fla. 1981); Wakulla County v. Davis, 395 So.2d 540 (Fla.1981), though we reversed that determination only five years later by creating exceptions for "unusual" cases. Makemson v. Martin County, 491 So.2d 1109 (Fla.1986), cert. denied, 479 U.S. 1043, 107 S.Ct. 908, 93 L.Ed.2d 857 (1987). Then in 1989, we held that "capital cases by their very nature can be considered extraordinary and unusual and arguably justify an award of attorney's fees in excess of the current statutory maximum fee cap." White v. Board of County Comm'rs, 537 So.2d 1376, 1378 (Fla.1989). On this rationale White held unlawful a fee that amounted to about $26.00 an hour in a capital case. See id. Other cases have held unlawful "capped" fees amounting to about $19.00 an hour, Remeta v. State, 559 So.2d 1132 (Fla.1990), and to about $11.60 an hour. Lyons v. Metropolitan Dade County, 507 So.2d 588 (Fla.1987). The fee paid Sheaffer thus clearly fell within a range condemned by the Makemson line of cases, even taking into account the passage of time.
Significantly, our cases have expressly premised the Makemson rule in part on the constitutional right to effective assistance of counsel:
Most fundamentally ... [a mandatory fee cap] interferes with the sixth amendment right to counsel. In interpreting applicable precedent and surveying the questions raised in the case, we must not lose sight of the fact that it is the defendant's right to effective representation rather than the attorney's right to fair compensation which is our focus. We find the two inextricably interlinked.
Makemson, 491 So.2d at 1112. As suggested by Makemson, id., a mandatory cap interferes with the right to counsel in two senses: (1) It creates an economic disincentive for appointed counsel to spend more than a minimum amount of time on the case; and (2) It discourages competent attorneys from agreeing to a court appointment, thereby diminishing the pool of experienced talent available to the trial court.
It is obvious that Mr. Sheaffer's comments in the penalty phase, quoted above, placed him within the first of these categories; and the fact that he was a young attorney unfamiliar with capital trials likewise placed him within the second. The result was a clear and unmistakable deficiency in performanceone for which this Court must share blame through our pre-Makemson cases. Indeed, the case for mitigation that Sheaffer failed to present is of a most serious order, including even the "mental mitigators" clearly provided by statute at the time of trial.
*627 The facts developed in the 3.850 proceeding below revealed that Bottoson grew up under the control of a dominant mother who was obsessed with religion and forced Bottoson to constantly read the Bible, pray, and preach from street corners from the time he was seven to nine years of age. Neighbors thought him strange, not merely because of his preaching but also because he sometimes babbled incoherently and claimed to have visions and conversation both with God and the devil. Bottoson suffered seizures so severe his mother sometimes had to hold him down. He once lost his temper and put his hand through a plate glass door, injuring himself badly. He was unable to function in school, was mocked by other children, and lived largely in a supernatural fantasy world.
At age 19, Bottoson married and proceeded to have a large family, which he was unable to support because of his failure to keep a steady job. Nevertheless, he loved his children, and they loved him in return. In time, Bottoson's emotional condition deteriorated further. In the summer of 1962 he attempted suicide inside his church, was taken to a psychiatric hospital, and was diagnosed with an acute schizophrenic episode. Bottoson's marriage failed shortly after his breakdown. Two other marriages came in quick succession, but during the third Bottoson began hearing voices ordering him to rob a bank. He made the effort, was quickly apprehended, and was diagnosed as paranoid schizophrenic, latent type. Despite this finding, the judge sentenced Bottoson to five years' imprisonment on the bank robbery, even though a mental health expert recommended supervised probation.
The third marriage failed around this time, and Bottoson married his fourth wife. Together, they moved to the Orlando area, where the present murder occurred. Bottoson continued to be dogged by the same problems of marital discord, financial problems, and the reemergence of psychotic symptoms.
In the proceeding below, Dr. Robert Phillips testified that Bottoson most likely has suffered from a psychosis known as schizoaffective or schizotypal disorder for most of his adult life. This opinion was based on an examination of Bottoson, a study of his medical records and psychiatric history, the fact that he has a daughter who has suffered from schizophrenia, and a history of treatment with antipsychotic medication. Dr. Phillips expressed the opinion that Bottoson suffered from active psychosis at the time of the killingwhich in itself would establish both of the statutory mental mitigators. There also was expert testimony available that Bottoson suffered visual and auditory hallucinations.
In the hearings below, Sheaffer admitted paying little attention to the penalty phase of trial. He made little effort to learn about Bottoson's psychiatric problems or other mitigating evidence relevant to the penalty phase. Two psychiatrists were appointed to assess Bottoson's competency to stand trial, but Sheaffer failed to ask either to investigate the existence of mental mitigators. In sum, he made no meaningful preparation whatsoever for the penalty phase, but focused almost entirely on guilt-phase issues. I emphasize, however, that the ultimate fault for this deficiency rests with the fee-cap arrangement, about which Sheaffer himself had complained at trial. And I cannot overlook the fact that this handicapping of the Sixth Amendment right to counsel was created by the State of Florida itself and this Court.
Our law is quite clear that severe mental disturbance is a mitigating factor of the most weighty order, Hildwin; Santos v. State, 629 So.2d 838 (Fla.1994), and the failure to present it in the penalty phase when available can constitute prejudicial ineffectiveness. Hildwin. Moreover I find that the present case presents at least as serious a case for mitigation and a far graver array of errors than those outlined in Hildwin. In Hildwin, the omitted mitigating evidence tended to establish the mental mitigators, just as they do here. But Hildwin was not coupled with the Hitchcock error that exists here nor the serious impediment to effective representation created by the fee cap applied to Sheaffer. The cumulative impact of these errors on the ultimate result of the penalty phase can only have been of a most serious order. I thus am constrained to view counsel's deficiency as prejudicial here, because it resulted in a *628 penalty phase that is unreliable, Hildwin, compounded by a Hitchcock error.
On that basis I believe relief must be granted. Accordingly, I would vacate the death penalty and remand for a new penalty phase before a jury. I otherwise concur with the majority.
SHAW and ANSTEAD, JJ., concur.
NOTES
[1] Claims barred for failure to raise them on direct appeal are: (1) that the trial court's instructions improperly diminished the jury's role contrary to Caldwell v. Mississippi;, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (2) that the trial court erroneously instructed the jury that seven votes were necessary for a recommendation of life imprisonment; (3) that the State improperly used its peremptory challenges to remove racial minorities from the jury venire; (4) that the record on direct appeal was incomplete; (5) that Bottoson's confrontation rights were violated because he was absent during certain proceedings; (6) that he was indicted by an illegally constituted grand jury; (7) that his rights were violated by a pattern of racial discrimination in the appointment of forepersons for Orange County grand juries; (8) that the jury was improperly instructed on the aggravating factor of avoiding arrest; (9) that the jury was improperly instructed on the aggravating factor of heinous, atrocious, or cruel; (10) that the jury was instructed as to aggravating factors not applicable to this case; (11) that the jury was not instructed to avoid the doubling of aggravating factors; (12) that Florida's "felony murder" aggravator is unconstitutional; and (13) that judge and jury weighed invalid aggravators.
[2] We find the following claims meritless on their face: (1) that the trial court violated Bottoson's attorney-client privilege by ordering trial counsel to give the State his files for the hearing below notwithstanding Bottoson's contention that trial counsel was ineffective, see Reed v. State, 640 So.2d 1094 (Fla.1994); (2) Bottoson's sentence of death was based upon an unconstitutional prior conviction; (3) Bottoson was denied a competent mental health examination; and (4) that the testimony of inmate Pertrell Juniara was falsified and a related claim that the falsification violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). With respect to this claim, there was conflicting evidence concerning the credibility of witnesses in the proceeding below, which the finder of fact was entitled to resolve.
[3] For much the same reason, we likewise find that the State did not violate Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by purportedly withholding evidence about the dog handler's qualifications. There is no reasonable probability that this evidence, even assuming it should have been disclosed, would have led to a different result. See Duest v. Dugger, 555 So.2d 849 (Fla.1990).
[4] There is disagreement in the Eleventh Circuit Court of Appeals as to the proper role of the strength of the aggravating circumstances in determining whether or not a Hitchcock error is harmless. See Delap v. Dugger, 890 F.2d 285, 306 n. 23 (11th Cir.1989), cert. denied, 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). We believe that the strength of the aggravating circumstances may be properly considered in determining whether a Hitchcock error is harmless because our capital sentencing procedure contemplates the weighing of aggravating and mitigating circumstances. In this case, however, we have no difficulty in concluding that the error was harmless predicated upon an analysis of the nonstatutory mitigating circumstances by themselves.
[5] It is axiomatic that attorneys will not be heard to argue their own ineffectiveness.