PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 29 2000
THOMAS K. KAHN
CLERK

_____

No. 98-2886

_____

D. C. Docket No. 97-457-CIV-ORL-19

LINROY BOTTOSON,

Petitioner-Appellant,

versus

MICHAEL W. MOORE,
Secretary, Florida Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 29, 2000)

Before ANDERSON, Chief Judge, TJOFLAT and COX, Circuit Judges.

ANDERSON, Chief Judge:

Linroy Bottoson was convicted of murder in the state courts of Florida and received a death sentence. The district court denied Bottoson's petition for a writ of habeas corpus pursuant to 28 U.S.C § 2254. We granted a certificate of appealability to review: (1) whether Bottoson's right to a reliable sentencing hearing was violated by the trial judge's instruction that the jury could consider only statutory mitigating evidence, the Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821 (1987), issue; and (2) whether Bottoson was denied the constitutional right to effective assistance of counsel at the penalty phase of his trial.[1] We now affirm.

## I. BACKGROUND

On Friday October 26, 1979, the Eatonville, Florida, post office was robbed, and money orders were taken. Catherine Alexander, the postmistress of Eatonville, was last seen leaving the post office on that day at around noon led by a tall

---

[1] We granted a certificate of appealability both on whether Bottoson was denied effective assistance of counsel in the sentencing phase of the trial and on whether Bottoson's trial counsel was prevented from providing effective assistance of counsel because of conditions created by statute or state law, including a statutory fee cap. However, we will consider these two issues together as part of Bottoson's claim for ineffective assistance of counsel at the penalty phase of his trial.

In his brief on appeal, Bottoson asserts a constitutional challenge to the application of AEDPA to his case. However, in his application to this court for a certification of appealability, he did not seek leave to present this issue, and thus this court did not grant a certificate of appealability with respect to it. Under these circumstances, we do not address this issue. Murray v. United States, 145 F.3d 1249 (11th Cir. 1998).

African-American man.  As she left, she whispered to bystanders to call the police and to tell them that the man was stealing.   Later that day, Bottoson's wife attempted to cash one of the missing money orders, and Bottoson and his wife came under suspicion.  Postal inspectors entered Bottoson's home on Monday October 29 and arrested him and his wife.  Upon searching Bottoson's home the next day, postal inspectors found the missing money orders and Mrs. Alexander's shoes.  Mrs. Alexander's body was found on the side of a dirt road on the same night that the Bottosons were arrested.  The victim had been stabbed fourteen times in the back and once in the abdomen.  The medical examiner testified that she died from crushing injuries to the chest and abdomen which were consistent with having been run over by an automobile.  The undercarriage of Bottoson's car, a brown Chevelle, contained hair samples and clothing impressions linked to the victim's hair and clothing.  Expert evidence indicated that clothing fibers similar to those in the victim's clothes and a tip of the victim's fingernail were found in the trunk of Bottoson's car.

At trial, witnesses could not identify Bottoson as the man seen leaving the post office with the victim but identified from a photograph a car, a red LTD automobile, that was rented to Bottoson at the time as the car in which the victim was taken away.  A postal inspector identified the money orders found in

3

Bottoson's home and traced them to the machine at the Eatonville post office. In addition, there was evidence that Bottoson deposited some of the stolen money orders in his bank account. Evidence was also presented that hair samples and clothing impressions found on Bottoson's car, a brown Chevelle, were consistent with having come from the victim's body. Expert evidence indicated that clothing fibers similar to those in the victim's clothes and a tip of the victim's fingernail were found inside Bottoson's car.

Bottoson's former wife, who was married to him at the time of the murder, testified that Bottoson was away from home around noon on Friday, October 26 and that he gave her a postal money order upon returning home. She testified that on the following Monday, she did not see him from 1:30 p.m. until 10:00 p.m. and that he had the brown Chevelle at the time. A jailhouse informant testified that Bottoson confessed to the murder and indicated that the best witness is a dead witness. He also testified that Bottoson said that "the old bitch had a lot of fight in her." Bottoson also gave a written confession to a minister in an effort to obtain leniency. In the confession, Bottoson wrote that "demon spirits" had "got on me."

Bottoson testified at trial. He testified that on October 26, he loaned the rental car to a man named Ernest and that Ernest returned with the money orders. He further testified that he loaned the brown Chevelle to Ernest on October 29, and

4

that, when Ernest returned, he admitted killing the victim. Ernest then drove Bottoson to the site of the murder and Bottoson got out of the car to look at the body. Bottoson denied making any confessions. A jury found Bottoson guilty of first-degree murder.

At the sentencing hearing, the state presented an FBI agent who testified that Bottoson was convicted of bank robbery in 1971. Bottoson's counsel presented the testimony of a minister, the minister's wife, and Bottoson's mother, who described Bottoson as kind, honest, respectable, caring, and unselfishly devoted to his church.

The jury recommended that Bottoson be sentenced to death, and the trial judge imposed a death sentence. The Florida Supreme Court affirmed the conviction and death sentence. See Bottoson v. State, 443 So.2d 962, 966 (Fla. 1983), cert. denied, Bottoson v. Florida, 469 U.S. 873, 105 S. Ct. 223 (1984).

In 1991, a postconviction hearing was held pursuant to Florida Rule of Criminal Procedure 3.850. The bulk of that hearing focused on Bottoson's claim that his lawyer was ineffective during the penalty phase of the trial. The court denied relief, and the Florida Supreme Court affirmed. See Bottoson v. State, 674 So.2d 621, 625 (Fla. 1996).

Bottoson then applied for a federal writ of habeas corpus on April 22, 1997. The District Court for the Middle District of Florida, Orlando Division, denied relief on June 2, 1998. We subsequently granted a Certificate of Appealability.

## II. STANDARD OF REVIEW

Because Bottoson filed his petition in April 1997, almost one year after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this case is governed by 28 U.S.C. § 2254 as amended by the AEDPA. Section 2254 provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1). A factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. See 28 U.S.C. § 2254(e).

A state-court decision is contrary to the Supreme Court's clearly established precedent (1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.  See Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1519-20 (2000).

A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Williams, 529 U.S. at __, 120 S. Ct. at 1520.  In addition, a state court decision involves an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  Id.

## III.  DISCUSSION

A. Hitchcock Claim

Bottoson argues that the jury instructions at his sentencing hearing violated Hitchcock v. Dugger, 481 U.S. 393, 107 S. Ct. 1821 (1987).  In Hitchcock, the Supreme Court held that instructions to an advisory jury and a sentencing judge not to consider nonstatutory mitigating factors rendered the resulting death sentence invalid.  See id. at 398-99, 107 S. Ct. at 1824-25.  The sentencing judge in that case refused to consider nonstatutory mitigating evidence, and there was no showing that the error was harmless.  See id. at 398-99, 107 S. Ct. at 1824.  In this case, the sentencing judge instructed the jury as follows:

> The mitigating circumstances which you may consider, if established by the evidence, are these:  A, that the Defendant has no significant history of prior criminal activity.  B, that the crime for which the Defendant is to be sentenced was committed while the Defendant was under the influence of extreme mental or emotional disturbance.  C, that the victim was a participant in the Defendant's conduct or consented to the act.  D, that the [Defendant] was an accomplice in the offense for which he is to be sentenced but the offense was committed by another person and the Defendant's participation was relatively minor.  E, that the Defendant acted under extreme duress or under the substantial domination of another person.  F, the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.  G, the age of the Defendant at the time of the crime.

Both the 3.850 hearing court and the Florida Supreme Court held that any such error in this case was harmless.  See Bottoson v. State, 674 So.2d at 622-23.  We cannot say that that determination was contrary to or involved an unreasonable

8

application of Supreme Court law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.

The sentencing court in this case allowed the presentation of non-statutory mitigating evidence and did not expressly tell the jury that it could not consider such evidence. In his closing remarks, the prosecutor told the jury "under the law, you all can bring in anything you want to by way of mitigation." The prosecutor then summarized the non-statutory mitigating evidence presented and expressly told the jury that it could consider the evidence. The non-statutory mitigating evidence that was presented consisted of testimony that Bottoson was a devout church member, counseled members of the congregation, was overheard counseling another prisoner, and was a good son. The Florida Supreme Court weighed the nonstatutory mitigating evidence presented and found the error harmless beyond a reasonable doubt. The Florida Supreme Court 's decision was not contrary to Hitchcock, and its conclusion was reasonable and supported by the record. We thus deny relief as to this claim.

B. Strickland Claim

In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court established a two-prong test that a habeas petitioner must satisfy to maintain an ineffective assistance of counsel claim:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. It is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure with respect to either prong constitutes a failure to demonstrate ineffective assistance of counsel. See Hill v. Lockhart, 474 U.S. 52, 56, 106 S. Ct. 366, 369-70 (1985). Both the 3.850 court and the Florida Supreme Court focused primarily on the prejudice prong, and we do likewise.

To satisfy the prejudice prong of the Strickland test, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068.

The claim of ineffective assistance of counsel that Bottoson presents in this appeal is that his trial counsel, Schaeffer, failed to investigate his background and

10

to discover and present mental health evidence at the penalty phase of Bottoson's trial.[2] As noted above, the AEDPA applies in this case. Therefore, findings of fact by the state court are presumed to be correct, and Bottoson must rebut the presumption of correctness by clear and convincing evidence. See 28 U.S.C. §2254(e). Furthermore, because this claim was adjudicated on the merits in the state court, we cannot grant the writ of habeas corpus unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; ... or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254(d). The standard for effective assistance of counsel, as enunciated in Strickland v. Washington is "clearly established" Supreme Court law. Williams v. Taylor, ___ U.S. ____, 120 S.Ct. 1495, 1511-12 (2000). The state court in the instant case applied the correct "reasonable probability" standard with respect to the prejudice prong, and the facts of the instant case are not materially indistinguishable from a decision of the Supreme Court concluding that the "reasonable probability" standard had been satisfied; thus, the state court

---

[2] Bottoson also argues that his counsel was ineffective generally for failure to adequately prepare for the penalty phase, and that the statutory fee cap in existence at the time of the trial prevented his attorney from rendering effective assistance. However, in light of our holding that Bottoson has failed to satisfy the prejudice prong, we find no merit to these claims.

11

adjudication in this case is not "contrary to" Strickland. See Williams v. Taylor,

__ U.S. at ___, 120 S.Ct. at 1519-20. Accordingly, the issue in the instant case is

whether the state court adjudication of this claim involved an unreasonable

application of Strickland. In light of the fact that the state court here has correctly

identified the governing legal rule, i.e., Strickland's "reasonable probability"

standard, the issue before this court is whether the state court adjudication involved

an unreasonable application of that standard. Williams v. Taylor, __ U.S. at ___,

120 S.Ct. at 1522.

Thus, we begin our analysis with the state court adjudication of this claim

and application of Strickland's prejudice prong. The 3.850 court held evidentiary

hearings in April and November of 1991, consisting of a total of about 10 days.

With the record of the proceedings at trial before him, and having personally heard

all of the evidence presented during the 1991 proceeding, the 3.850 judge

concluded as follows with respect to Strickland's prejudice prong:

> In any event, this court has extensively reviewed this claim in light of the
> entire record, and finds that even if counsel's performance may have been
> deficient in some respects, any failure was not prejudicial pursuant to
> Strickland, 466 U.S. at 668. The mitigating evidence now presented would
> not outweigh or overcome the aggravating circumstances of this murder.
> Defendant's background, childhood experiences (defendant was 41 years old
> at the time of trial) and religious eccentricities do not compare to the
> aggravating factors that (1) Mr. Bottoson had been previously convicted of a
> felony, (2) the murder occurred during the commission of a felony, (3) the
> murder was committed to avoid arrest, and (4) the murder was especially

12

heinous because of the kidnaping, long confinement and mode of killing of the 74-year old victim.

Order Denying Motion for Post-Conviction Relief, February 5, 1993, at 14.

On appeal from the order of the 3.850 court, the Florida Supreme Court addressed the merits of this claim and said the following with respect to Strickland's prejudice prong:

> The record of the post-conviction hearing reflects that Bottoson told Schaeffer that he had been treated for depression in Ohio and in connection with his prior robbery conviction in California....
>
> The post-conviction record further shows that Sheaffer had no personal reservations concerning Bottoson's mental health, but in order to be certain he had him examined by two psychiatrists. Although these were competency examinations, the psychiatrists' reports necessarily discussed all aspects of Bottoson's mental health. After reviewing these reports and talking with one of the psychiatrists, Dr. Kirkland, Sheaffer concluded that the presentation of mental health testimony would not be helpful to Bottoson. ...
>
> Dr. Kirkland, who also testified at the post-conviction hearing, said that Bottoson had told him of the psychiatric treatments he had received in Ohio and California. He was aware that Bottoson had experienced religious hallucinations, but observed that psychiatrists are loathe to say that this would indicate that a person is abnormal or mentally ill. Dr. Kirkland was then shown a card reflecting Bottoson's medical diagnosis in Ohio, obtained by the Capital Collateral Representative's investigator from another hospital to which Bottoson's records had been transferred. The card referred to a 1962 diagnosis of acute schizophrenic episode with the words "discharge improved." Dr. Kirkland testified that in 1962 this referred to a person who had had a short psychotic episode from which he had recovered. He said that had he been provided with that document he would not have changed his original evaluation. Dr. Kirkland said that the information on the card together with the medical reports which the Capital Collateral

13

Representative was able to obtain from California would have led him to conclude that Bottoson was a latent schizophrenic. He explained that this was a term used to describe a schizophrenic who had gotten better.

...

Yet, even with the benefit of both the Ohio and California records, Dr. Kirkland did not indicate that he would have testified that any statutory mental mitigators were present. While the Capital Collateral Representative's psychiatrist, Dr. Phillips, who examined Bottoson eleven years after the murder, testified that both of the statutory mental mitigators were present at the time of the crime, the trial judge was entitled to discount his opinion. ...

The evidence presented below was conflicting. However, there was competent, substantial evidence to support the judge's findings and conclusions. Even if we assume some deficient performance on the part of Sheaffer, we cannot say that the evidence raises a reasonable probability that the result would have been different if Sheaffer had introduced mental health testimony or called witnesses to describe this forty-one-year old man's troubled childhood.

Bottoson v. State, 674 So.2d 621, 624-25 (Fla. 1996). As indicated above, the issue before this court is whether the adjudication of the claim in state court resulted in a decision that involved an unreasonable application of the Strickland prejudice prong.

The appropriate analysis of the prejudice prong of Strickland requires an evaluation of "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." Williams v. Taylor, __ U.S. at ___, 120 S.Ct.

14

at 1515.  In <u>Williams</u>, the Court held that the state court adjudication involved an unreasonable application of <u>Strickland</u>'s prejudice prong in part because the state court failed to evaluate the totality of the evidence.  <u>Williams</u>, 120 S.Ct. at 1515, 1525.  The Florida Supreme Court in the instant case determined that the 3.850 court discounted Dr. Phillips's opinion, and that it was appropriate to do so under the circumstances.  When there is conflicting testimony by expert witnesses, as here, discounting the testimony of one expert constitutes a credibility determination, a finding of fact.  A finding of fact made by a state court is presumed to be correct, and a habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  <u>See</u> 28 U.S.C. §2254(e)(1).  As a preliminary matter, we examine the state court's discount of Dr. Phillips's opinion pursuant to 28 U.S.C. §2254(e)(1).

First, we note that the Florida Supreme Court found that the 3.850 judge had discounted Dr. Phillips's opinion, notwithstanding the fact that the 3.850 judge did not do so explicitly. We conclude that the Florida Supreme Court reasonably inferred that the 3.850 judge had discounted Dr. Phillips's opinion.  The 3.850 judge personally presided over the 10-day hearing, the bulk of which focused on this claim and counsel's effort to demonstrate mental health mitigating circumstances.  Dr. Phillips's testimony was clearly the most significant evidence

15

presented by Bottoson. Dr. Phillips opined that Bottoson suffered most of his life from a mental disease known as an schizoaffective disorder, that Bottoson was experiencing an acute or active phase thereof at the time of the offense, and that Bottoson was at the time of the offense under the influence of extreme mental or emotional disturbance, and that at the time of the offense Bottoson's capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law was substantially impaired. In other words, Dr. Phillips testified that two statutory mitigating factors were present. Notwithstanding the obvious significance of Dr. Phillips's opinion, the 3.850 judge, in weighing the mitigating evidence presented during the 1991 proceedings, mentioned only defendant's background, his childhood experiences, and his religious eccentricities. In light of the fact that Dr. Phillips's testimony was in conflict with the testimony of Dr. Kirkland, and in light of the fact that the 3.850 judge explicitly stated that he had considered "the entire record," the only reasonable inference is that the 3.850 judge did in fact discount the testimony of Dr. Phillips, as the Florida Supreme Court found that he did. We conclude that the finding of the Florida Supreme Court to this effect is amply supported by reasonable inferences from the opinion of the 3.850 court.

16

Second, we inquire whether the finding of fact discounting Dr. Phillips' opinion is entitled to the statutory presumption of correctness. As noted, Dr. Phillips's opinion was in conflict with that of Dr. Kirkland. Dr. Kirkland had evaluated Bottoson before trial, and had opined that Bottoson was competent to stand trial. Dr. Kirkland also testified at the 1991 evidentiary hearing. He expressly disagreed with the findings of Dr. Phillips. In his testimony, Dr. Kirkland agreed with Dr. Phillips only insofar as Dr. Kirkland also thought that it was likely that Bottoson suffered from the mental illness of schizophrenia. However, it is clear from Dr. Kirkland' testimony that he believes that Bottoson's schizophrenia is of the latent type, that is, in remission most of the time. It is also implicit in Dr. Kirkland's testimony that the mental illness of schizophrenia would play a motivating role in a person's commission of a crime only if the schizophrenia were in an acute or active phase. Dr. Kirkland explains in some detail the appropriate way one would go about retroactively determining whether or not a person's schizophrenia was in an acute or active phase at the time of a crime. Dr. Kirkland's road map for such determinations would include the following: examination of the details of the crime and the actions of the accused with a view to whether they evidenced logical thought processes, on the one hand, or fragmented, psychotic thought processes, on the other hand; examination of the

17

statements of witnesses who would have observed the accused during the time frame of the crime to determine whether the person was experiencing hallucinations or other indications of psychotic behavior; and examination of the evidence to assess whether actions were motivated by normal motivations or psychotic motivations. In our discussion below, we have followed Dr. Kirkland's road map, and concluded that the evidence in the instant record strongly suggests that Bottoson was not in fact experiencing an acute or active phase of his schizophrenia during the time frame of the crime and thus that Bottoson's latent mental illness would likely play a much less significant role in Bottoson's actions. Because the appropriate analysis laid out by Dr. Kirkland points strongly to a conclusion contrary to the opinion of Dr. Phillips, and because Dr. Kirkland expressly disagreed with Dr. Phillips's findings, we conclude that there is support in the instant record for the finding of fact of the state court discounting Dr. Phillips's opinions. Accordingly, we conclude that Bottoson has failed to rebut the presumption of correctness by clear and convincing evidence. Therefore, the failure of the state court to consider Dr. Phillips's opinions as part of the totality of the evidence does not constitute an unreasonable application of Strickland's prejudice prong. Furthermore, in our own consideration of the totality of the evidence, we also will discount Dr. Phillips's opinions.

18

We turn now to an examination of the totality of the evidence to determine whether the adjudication of this claim in the state court resulted in a decision that involved an unreasonable application of Strickland's prejudice prong. As noted, in considering the totality of the evidence, we discount the opinions of Dr. Phillips.

We turn first to the evidence of aggravation in this case. The sentencing judge found that Bottoson had previously been convicted of a crime involving a threat of violence (the 1971 California bank robbery), that the instant crime was committed during the commission of a felony (both the robbery of the post office and the kidnaping), that the crime was committed for the purpose of avoiding arrest, and that the crime was especially heinous, atrocious or cruel. The facts of the instant crime are egregious, and fall comfortably within the meaning of the Florida aggravating circumstance "especially heinous, atrocious or cruel." The evidence reveals a murder committed to eliminate the only witness who could surely identify Bottoson. The murder was accomplished by repeatedly stabbing the victim with a knife, more than 14 times. Then, with the victim still alive, the murder was completed by running over the victim with an automobile, resulting in crushing injuries to the chest and abdomen, from which the victim finally died. The victim had been kidnapped and kept captive for three days. In closing argument, the prosecutor asked the jury to infer that the victim was kept during this

19

time in the trunk of Bottoson's car. It is certain that the victim spent some time in the trunk of that car. Clothing fibers and the right little fingernail, both linked to the victim, were found in the trunk. There was testimony that the trunk reeked of the smell of urine.

We now summarize the mitigating evidence which is to be weighed against the foregoing aggravating circumstances. At the penalty phase of the 1981 trial, counsel for Bottoson presented four witnesses, a minister and the minister's wife, a correctional officer, and Bottoson's mother. The minister and his wife explained Bottoson's dedication to the church and its members, as well as his nonviolent nature. The minister testified that Bottoson was the assistant pastor of his church, that the minister handled the service on the second and fourth Sundays of the month, and that Bottoson carried the service on the first and third Sundays. The congregation apreciated Bottoson and approved of his handling of the services. He testified that Bottoson devoted himself unselfishly to the church. He also testified that Bottoson had never exhibited any violent tendencies; rather, he was kind at all times. Finally, the minister expressed his serious doubts that Bottoson committed this crime. Bottoson's mother testified that Bottoson had never hurt anybody, and had never threatened anybody. She testified that he went into the ministry at 13 to 14 years old, and was ordained at 14 or 15. She testified that he had six children,

and begged for mercy. Counsel for Bottoson also called a correctional officer from the jail that housed both Bottoson and Pertrell Kuniara (a fellow inmate who had testified that Bottoson had confessed to him, which Bottoson disputed in his own trial testimony). The officer testified that he had overheard that very morning Kuniara telling a minister that the prosecutor came to see him yesterday and that he, Kuniara, was going to be released from jail. This of course tended to impeach Kuniara's testimony that Bottoson had confessed, and tended to support counsel's effort at sentencing to persuade the jury that there was a lingering doubt about Bottoson's guilt.

At the penalty phase of the 1981 trial, counsel for Bottoson brought out, on cross-examination of the FBI officer who had investigated the 1971 California bank robbery, the fact that the California judge at sentencing had recommended psychiatric evaluations for Bottoson. All of the other mental health mitigating evidence was adduced at the 1991 evidentiary hearing in the 3.850 court, and can be summarized as follows. In 1962, Bottoson attempted to commit suicide, and was hospitalized for approximately two weeks, was diagnosed as having had an acute episode of schizophrenia, and was discharged as improved. The hospital records with respect to this incident were destroyed by fire, and the only evidence in the record is a card revealing the foregoing, which was uncovered from another

21

Cleveland institution by the diligent efforts of Collateral Counsel. Bottoson's brother testified at the 1991 hearing that Bottoson's attempted suicide was triggered by Bottoson's concern about, and inability to deal with, the situation he was then facing with respect to his very severely retarded young son. In 1971, Bottoson was evaluated by a psychiatrist in California, Dr. Verin, after having been arrested for bank robbery in Fresno, California. Dr. Verin's report indicated that Bottoson heard a voice telling him to rob the bank. Dr. Verin's conclusion was "paranoid schizophrenia, latent type," and he recommended further psychological attention.

The foregoing is the only evidence in the instant record of Bottoson's having experienced an acute or active psychotic episode. Indeed, the 1962 Cleveland, Ohio, incident may be the only one. The diagnosis in the 1971 California incident was schizophrenia, latent type, although there was evidence at that time that Bottoson was hearing voices telling him to rob the bank. There is no clear evidence in the record on appeal that Bottoson experienced any other acute or active psychotic episode.

However, there is considerable evidence that several laymen (i.e., not medical experts) over the years have labeled Bottoson's behavior as strange or bizarre. The gist of this evidence is that Bottoson was, from a very young age,

22

unusually preoccupied with religion. Even as a pre-teen, he would accompany his mother as they preached on street corners, Bottoson carrying along his little soap box as he preached. Bottoson was ordained as a minister in the Church of God in Christ at the age of perhaps 15. In his later teens, he continually worked (though apparently without compensation) as an assistant to several ministers, and preached sermons from time to time. One member of a congregation, who testified at the 1991 hearing, remembered two occasions when Bottoson preached; she thought his preaching was incoherent. Several others related bizarre incidents which led them to believe that Bottoson needed psychiatric care. For example, Reverend Robinson testified at the 1991 hearing that Bottoson assisted in his church after he was ordained, and would preach whenever Reverend Robinson would let him. He related that one day when no one was in the church, Reverend Robinson found him lying down on the altar, praying and stomping and beating the floor and telling the Lord of his need and asking the Lord to come bless him. Reverend Robinson indicated that he called Bottoson by name, whereupon Bottoson stopped, got up, and was calm. Reverend Robinson thought that the incident was strange, but did not question Bottoson's mental health. From an early age, Bottoson apparently believed that God had given him the gift of healing, although such beliefs were not uncommon in the Church of God in Christ. This kind of belief was known at the

time of trial to the trial judge,[3] Bottoson's attorney, and Dr. Kirkland who examined Bottoson with respect to competency to stand trial.

Dr. Kirkland referred to these beliefs and to Bottoson's religious hallucinations both in a 1981 report to the trial judge and in his testimony at the 1991 evidentiary hearing. In his 1981 evaluation of Bottoson, Dr. Kirkland learned that Bottoson felt he had special powers of healing and that he might be able to raise people from the dead. Dr. Kirkland testified in 1991 that his evaluation of Bottoson in 1981 revealed that Bottoson was dressed appropriately, his actions were appropriate (neither too busy nor lethargic), he was oriented to his surroundings, his emotional tone or affect was appropriate (not depressed or euphoric), his thought processes were appropriate and logical. Dr. Kirkland testified that the issue of hallucinations that have a connection to religion are somewhat difficult for the psychiatrist. He testified that psychiatrists are loathe to say that such religious practices, if supported by others, are psychotic, even if they have that appearance.

With the evidence of Bottoson's 1962 hospitalization and Dr. Verin's 1971 diagnosis of latent schizophrenia in hand, Dr. Kirkland testified that he would likely consider Bottoson to be a person suffering from the mental disease of

---

[3] Bottoson wrote several letters to the trial judge to this effect.

24

schizophrenia, though in remission.[4] It is clear from Dr. Kirkland's testimony that such a person would sometimes suffer from symptoms of the disease, and sometimes not. That is, such a person would have acute or active stages of the disease, and times of remission.

We note, but discount pursuant to the state court finding, that Dr. Phillips drew a causal and temporal connection between Bottoson's mental disease and his actions in committing the instant crimes, assuming that Bottoson was suffering from an acute or active phase of schizophrenia at the time. Other than Dr. Phillips's bald conclusion to this effect, there is only very weak evidence in the record on appeal that Bottoson was in fact experiencing an acute or active episode of schizophrenia at the time. We summarize the evidence which might tend to point in the direction of acute schizophrenia as follows. There is the fact that the instant egregious crime of violence is inconsistent with Bottoson's usually nonviolent demeanor. There is also the fact that Bottoson was at the time overdrawn at the bank in the amount of about $6,000, and the inference therefrom

---

[4] We note that Dr. Verin's diagnosis of schizophrenia, latent type, is consistent with Dr. Kirkland's opinion. Moreover, the medical records with respect to the California incident indicate that Bottoson was considered mentally competent at the time, was presently functioning in an acceptable manner, and was not sufficiently ill to be hospitalized.

of some stress.[5] There is also Bottoson's written "confession" delivered to the prosecutor through the ministers, in which he asserted "demon spirits" had "got on me" at the time. However, that "confession" was made approximately a year after the crime, and was an obvious attempt to seek leniency (i.e., a 14-year term to run concurrently with his federal sentence). Finally, there are the letters written by Bottoson around the time of the trial indicating his belief that the Lord had given him special powers (e.g., healing and even raising the dead). The significance of this evidence has to be weighed, keeping in mind that Bottoson had apparently held such beliefs at least since his late teens (and thus are probably consistent with latent stages of his mental illness), and that Dr. Kirkland testified that psychiatrists are loathe to label such religious practices as psychotic, if they are supported by others (and there is evidence here that such beliefs are held by others in Bottoson's church).

---

[5]     Apparently Dr. Phillips's belief that Bottoson was experiencing stress is the primary basis for Dr. Phillips's belief that Bottoson was experiencing an acute or active episode of schizophrenia. Other than the fact that Bottoson was overdrawn at the bank, we find very little other evidence in the record that Bottoson was laboring under any unusual stress at the time. According to his then wife's testimony, his behavior at the time was completely normal. She had no understanding that they were in financial trouble. Bottoson and his wife had just recently bought a house and moved in. Bottoson had just recently started a business of his own. He was active at the time as assistant pastor of Reverend Johnson's church. Although Dr. Phillips indicated there were marital difficulties at the time, there is no such suggestion in the then wife's testimony. Rather, she testified that she divorced Bottoson about a year after the crime, and that the divorce was triggered by the crime.

On the other hand, there is considerable evidence that Bottoson was not suffering from an acute episode of schizophrenia at the time. There is evidence that Bottoson planned to rob the Eatonville Post Office several days in advance. On Friday, October 26, 1979, Bottoson left his office at about 10:30 a.m., drove the 25 miles to Eatonville, robbed the Post Office which he had "cased" several days before, and kidnaped the Postmistress victim in the instant case. From the time of the kidnapping on Friday, until Bottoson's arrest at 10:50 p.m. Monday evening, October 29, the state's witnesses trace Bottoson's actions, accounting for the greatest portion of the intervening time, but leaving several gaps unaccounted for, including the period of time during which the medical examiner testified that death probably occurred, namely between 7:00 p.m. and 11:00 p.m. on that Monday, October 29, 1979. The jury obviously inferred from the state's evidence that Bottoson's actions were careful and premeditated, that he successfully hid the live kidnapping victim for three days, while Bottoson himself made appearances before numerous witnesses (his wife, her friend, Ms. Sheard, the church congregation, persons he saw on the twenty-four hour plus visit and wedding in Macon, and an employee at his office), all the while acting as if nothing had happened. None of the numerous people who saw Bottoson during the crucial four days testified that he was having hallucinations or gave any other indication that he was experiencing

an acute episode of schizophrenia. There was no such testimony at trial or at the 1991 evidentiary hearing. To the contrary, Bottoson's former wife, who was with him for most of the time during the crucial three to four days, testified repeatedly that there was nothing about his behavior that was out of the ordinary, nothing to suggest that he was carrying around some great weight. Moreover, the accounts given by defendant of the events of the those crucial days, including the account given in his trial testimony, were delivered in a logical, articulate manner. The version of the events given by Bottoson in his trial testimony very carefully account for the evidence which Bottoson knew the state had (e.g., that the murder weapon, the brown Chevelle, belonged to him and he was found in possession of the money orders, that the victim's shoes and the knife which was probably used to stab the victim were found on the porch of his house). In other words, Bottoson's trial testimony was reasonably viewed as a careful and calculated attempt to create an alibi.

To assist in our assessment of the extent to which the evidence suggests that Bottoson was experiencing an acute or active episode of schizophrenia during the time frame of the offense, we follow the road map laid out in Dr. Kirkland's testimony. First, we examine the details of the crime and the actions of the accused with a view to whether they evidenced logical thought processes or fragmented,

28

psychotic thought processes. As indicated above, the details of the crimes and the evidence of Bottoson's actions suggest, not fragmented or psychotic thought processes, but rather careful and logical planning. Bottoson planned several days in advance to rob this particular post office, apparently planning to steal money orders. He implemented the plan calmly. Bottoson successfully hid the kidnapping victim for three days, while he himself appeared without the kidnapping victim before numerous witnesses and for extended periods of time, all the while behaving normally and without raising any suspicions. On Saturday afternoon, he exchanged the red LTD rental car he had used in the robbery and kidnapping for a blue LTD, claiming mechanical difficulties. Bottoson's actions seem to have been carefully planned and logically directed toward the aim of hiding the victim and concealing his crimes. Although it was obviously not smart to cash the money orders (or indeed to commit the crimes themselves), his actions do not appear to be loose or fragmented, as Dr. Kirkland described psychotic thought processes, but rather appear logical and goal directed.

Second, we examine the statements of witnesses who would have observed the accused during the time frame of the crime to determine whether they observed hallucinations or other indications of psychotic behavior on the part of Bottoson. The eyewitnesses to the robbery and kidnapping testified at trial and pointed to no

29

strange or bizarre behavior on the part of Bottoson as the robbery and kidnapping unfolded. Nor was there any such testimony at the 1991 evidentiary hearing. Bottoson and his wife cashed some of the money orders on Friday afternoon, ate dinner together and watched TV that evening. Bottoson and his wife spent the next morning, Saturday, October 27, picking up his wife's friend, Mrs. Sheard at the airport. Bottoson and his wife spent about three hours that Saturday evening at church, and then left with his wife and Mrs. Sheard around midnight and traveled to Macon, Georgia, for a wedding, returning only early in the morning hours of Monday, October 29. None of the numerous people who saw Bottoson during this crucial period of time testified that he was having hallucinations or that he gave any other indication that he was experiencing an acute episode of schizophrenia. There was no such testimony either at trial or at the 1991 hearing. To the contrary, the evidence is that Bottoson's behavior was normal. Bottoson has failed to adduce any testimony from persons in position to observe him that he was experiencing an acute or active episode of schizophrenia during the crucial three to four day period.

Finally, following Dr. Kirkland's road map, we examine the evidence to assess whether Bottoson's actions were motivated by normal motivations or psychotic motivations. There is clear evidence of "normal" motivations, i.e.,

30

nonpsychotic motivations. There is evidence that the robbery was motivated by a desire to obtain money orders to alleviate Bottoson's overdrawn status. There is direct evidence that Bottoson's murder of the kidnapping victim was motivated by a desire to eliminate the witness who could surely identify him.

While there is some evidence suggesting the possibility that Bottoson was experiencing an acute or active episode of schizophrenia,[6] stronger evidence suggests that he was not. Under these circumstances, we cannot conclude that the decision of the state court in this respect was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d)(2). Thus, accepting the fact that Bottoson was not experiencing an acute or active episode of schizophrenia during the time frame of the offense, we cannot conclude that the state court was unreasonable in determining that Bottoson's latent mental illness played an insignificant role with respect to the motivation of Bottoson's actions in committing the instant crimes.

Upon consideration of the entire record, the state court concluded that Bottoson had failed to satisfy Strickland's prejudice prong, i.e., that Bottoson had failed to show that there is a reasonable probability that, but for counsel's deficient

---

[6]    Probably the strongest evidence is the fact that this egregious and violent crime seems to be inconsistent with the non-violent, kind demeanor which Bottoson has usually presented.

31

performance, the result of the sentencing phase would have been different.  For the foregoing reasons, we cannot conclude that the adjudication of this claim in the state court resulted in the decision that involved an unreasonable application of Strickland's "reasonable probability" standard.

AFFIRMED.[7]

---

[7]     Appellee's motion to strike Appellant's Supplemental Brief is denied.