[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 16, 2006
THOMAS K. KAHN
CLERK

No. 04-16751

D. C. Docket No. 01-00067 CV-JTC

CURTIS OSBORNE,

Petitioner-Appellant,

versus

WILLIAM TERRY,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

**(October 16, 2006)**

Before BIRCH, DUBINA and PRYOR, Circuit Judges.

DUBINA, Circuit Judge:

Petitioner, Curtis Osborne ("Osborne"), a death row inmate, appeals the district court's order denying him federal habeas relief pursuant to 28 U.S.C. § 2254. After a thorough review of the record, and having the benefit of the parties' briefs and oral argument, we affirm the district court's judgment.

## I. BACKGROUND

A. *Facts*

Special Agent David Mitchell ("Agent Mitchell") of the Georgia Bureau of Investigation ("GBI") testified at Osborne's trial that at approximately 1:45 p.m. on August 7, 1990, he received a call to investigate a murder on Pine View Road in Spalding County, Georgia. When he arrived at the scene, Agent Mitchell noticed glass fragments lying in the dirt roadbed and saw a 1978 Pontiac Grand Prix about 40 yards from the glass. The car was in gear and still running. Agent Mitchell observed that the driver's side window was shattered and part of the glass was inside the car on the front seat, floorboards, and armrests. The windshield was cracked, and the passenger window was rolled down. Agent Mitchell saw two individuals, a woman, later identified as Linda Lisa Seaborne ("Seaborne"), and a man, later identified as Arthur Jones ("Jones"), in the front seat of the car. Seaborne, who was in the driver's seat, was slumped over Jones. Both victims had

been shot. Agent Mitchell also noticed a black stick, similar to a policeman's nightstick, lying on the floorboard to the rear of the driver's seat.

Agent Mitchell testified that he inspected the car and noticed that a bullet had struck the windshield and passed underneath it through the padded dash. The bullet was lying on the vent. There was also a bullet resting on the driver's door where the glass was shattered. Jones had sustained a gunshot wound below his left eye, and Seaborne had been shot in the neck. Agent Mitchell stated that there was blood all over the interior of the vehicle.

Special Agent Chris Tolbert ("Agent Tolbert") of the GBI testified that early on the day following the crime, he interviewed Jones's sister, Melinda Jones ("Melinda"), and Jones's mother. Melinda's boyfriend, Osborne, was at her house when Agent Tolbert arrived. Osborne told Agent Tolbert that three weeks earlier, Jones had asked Osborne to help him (Jones) sell his (Jones) motorcycle. Osborne stated that he did not sell the motorcycle and had not spoken to Jones since that time. Osborne also told Agent Tolbert that the only contact he had with Seaborne was several days earlier when he was trying to change the title on Jones's motorcycle.

Agent Tolbert interviewed Marcus Matthews ("Matthews"), who told Agent Tolbert that a week before the murders, Osborne sold him Jones's motorcycle for

$400. After obtaining this information, Agent Tolbert considered Osborne a suspect and gave Osborne his Miranda rights before interviewing him a second time. Osborne repeated the same story that he had told Agent Tolbert earlier. Osborne elaborated a bit, though, and told Agent Tolbert that Jones had approached him about selling the motorcycle because he needed the money. Osborne had offered Jones an opportunity to sell cocaine for money, but Jones declined.

The next day, police arrested Osborne and interviewed him again. During this interview, Osborne admitted that he had sold Jones's motorcycle to Matthews, and he had kept the money. Osborne denied any involvement in the shootings and consented to a gun residue test. He informed the police that the test would be positive for gun residue because he fed his dog gunpowder on a daily basis. Osborne explained that the blood under his cuticles was the result of a hangnail. He also told police that his fingerprints could be on the car in which the victims were found because he had ridden in the car a week earlier when he went to WalMart, where Seaborne worked, to get a title for the motorcycle, and Seaborne asked him to move her car from one parking spot to another. Osborne provided police with the clothes he was wearing on the day of the murders, but he told the police that his mother previously had washed the clothes in bleach.

4

Spalding County Sheriff Richard Cantrell ("Sheriff Cantrell") testified at trial that he interviewed Osborne on August 10, 1990. Sheriff Cantrell taped the interview. During the interview, Osborne told Sheriff Cantrell that on the day of the crime, he left a message for Jones to come to Griffin, Georgia, to pick up the money from the sale of Jones's motorcycle. Osborne stated that he spent the rest of the day on the street selling cocaine. Osborne further stated that later in the day, Jones and Seaborne approached him and told him to get in the car. Jones then hit Osborne with a nightstick. Jones asked Osborne for the money from the sale of the motorcycle, and Osborne told him that the money was in a hotel room with two Cuban drug dealers from Florida named Jeff and Scott. Osborne stated that they stopped at a motel, and one of the Cuban drug dealers gave Osborne a .38 caliber gun that he put in his pants. Osborne further stated that he shot Jones in the back of the head because Jones had threatened to beat him and was reaching for a weapon on the floorboard of the car. Osborne stated that he climbed out of the driver's side window and ran. At no time did Osborne state where he left his gun and pager.

Ron Buchanan ("Buchanan"), an investigator with the Sheriff's Department testified that he searched for a weapon and pager, but could not find either. Buchanan also testified that he went by the hotel where Osborne claimed the

Cuban drug dealers were staying, and Osborne pointed out Room 213 as the room they occupied. However, the manager of the hotel, Ramesh Parekh, testified that the hotel records showed that Room 213 was not occupied on the day in question.

Dr. Randy Hanzlick ("Dr. Hanzlick"), the Fulton County medical examiner, testified that he performed the autopsies on the victims. The autopsy of Jones revealed that he died as a result of a gunshot wound to the back of the head which exited to the left of his eye. The blood pattern showed that Jones's body was in an upright position when he was shot and that the gun was only an inch away from his head when the perpetrator fired. The bullet fractured Jones's skull, causing hemorrhage and destruction of brain tissue. Dr. Hanzlick stated that the wound would indicate that the perpetrator used a .38 caliber, 9 millimeter, or a .357 magnum weapon; more likely, it was a 9 millimeter or a .357 magnum.

Dr. Hanzlick testified that Seaborne died as a result of a gunshot wound to the back of the neck. The bullet entered the right side of her neck, grazed the shoulder up through the spinal cord, went through the bottom of her skull and exited through her left cheek. He stated that the gunshot wound was inflicted from one to two feet away from Seaborne. Dr. Hanzlick testified, however, that the wound was not typical of an "execution" style wound. (State Record Exh. 6, pp. 1268-69.)

6

Additionally, Osborne's mother testified that her husband's .357 Ruger was missing. Kelly Fite, the state crime lab firearms examiner testified that she received a .357 magnum lead bullet that Agent Tolbert had found at Osborne's home pursuant to a search warrant. Larry Hankerson, the latent fingerprint examiner, testified that Osborne's fingerprints were found on the door of the driver's side of the vehicle in which the victims' bodies were found.

B. *Procedural History*

A Spalding County jury convicted Osborne on two counts of malice murder and two counts of felony murder, with the underlying felonies consisting of aggravated assault. The jury found that Seaborne's murder was committed in the course of Jones's murder, itself a capital felony. The jury based their death recommendation on this aggravating circumstance.

Following the trial court's denial of his motion for new trial, Osborne filed his direct appeal in the Georgia Supreme Court, which affirmed Osborne's convictions and sentences. *See Osborne v. State*, 430 S.E.2d 576 (Ga. 1993). Osborne filed a petition for writ of certiorari, which the United States Supreme Court denied. *See Osborne v. Georgia*, 510 U.S. 1170, 114 S. Ct. 1205 (1994). Osborne then filed a state habeas corpus petition on June 28, 1994, and filed an amended petition on May 31, 1996. The trial court conducted an evidentiary

7

hearing in September 1996 and thereafter denied Osborne habeas relief. Osborne filed an appeal from the trial court's denial of state habeas relief and an application for certificate of probable cause ("CPC") to appeal. The Georgia Supreme Court denied Osborne's application for a CPC on April 28, 2000, and the United States Supreme Court subsequently denied Osborne's petition for certiorari review.

On April 24, 2001, Osborne filed his federal habeas petition, including for the first time a claim that his trial counsel's performance was deficient because trial counsel exhibited racial animosity toward Osborne. Osborne subsequently filed an amended petition. After the State responded, the district court denied Osborne relief on certain claims raised in his amended petition. The district court initially dismissed Osborne's claim of racial animosity, then upon motion to reconsider, asked the parties to be prepared to argue at the habeas hearing whether the claim should be reinstated. In the interim, Osborne filed a second state habeas petition raising the racial animosity claim. The state court denied relief on the claim. (Federal Record, Vol. 2-14.)

On February 21, 2003, the district court conducted oral argument on the petition. The parties addressed the racial animosity claim in terms of exhaustion, procedural default, and necessity for discovery. On August 18, 2003, the district

court denied Osborne federal habeas relief on the claims raised in his amended petition, including the racial animosity claim, with the exception of a claim of ineffective assistance of appellate counsel. (*Id.* at Vol. 1-22.) The district court later denied Osborne relief on this claim as well. (*Id.* at Vol. 1-32.) Osborne then filed a motion for new trial and/or to alter or amend judgment, which the district court denied. Osborne filed a notice of appeal and a motion for a certificate of appealability ("COA"). The district court granted the COA as to three claims of ineffective assistance of counsel. This court denied Osborne's request to expand the COA.

## II. ISSUES

1. Whether Osborne's trial counsel rendered ineffective assistance of counsel by failing to conduct a full independent investigation of the circumstances underlying the guilt and penalty phases of Osborne's trial.

2. Whether Osborne's trial counsel rendered ineffective assistance of counsel by operating under such a conflict of interest as a result of his substantial caseload that prejudice to Osborne may be presumed under *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039 (1984).

3. Whether Osborne's trial counsel acted with a racially discriminatory purpose at trial and sentencing, thus contributing to the imposition of the death

9

penalty in violation of Osborne's rights under the Eighth Amendment to the U.S.

Constitution. *See McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756 (1987).

## III. STANDARDS OF REVIEW

This court reviews for clear error the district court's findings of fact and

reviews *de novo* both questions of law and mixed questions of law and fact.

*Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000). An ineffective assistance

of counsel claim is a mixed question of law and fact that the court reviews *de

novo*. *See Dobbs v. Turpin*, 142 F.3d 1383, 1386 (11th Cir. 1998). Since

Osborne's petition was filed after the effective date of the Anti-Terrorism and

Effective Death Penalty Act ("AEDPA"), we, in essence, review the decisions of

the state courts. Pursuant to AEDPA,

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2). Furthermore, a state court's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence. *Id.* at 2254(e)(1).

> A state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. *See Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000).
>
> A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case. *See id.* An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. *See id.* Notably, an "unreasonable application" is an "objectively unreasonable" application. *See Williams [v. Taylor]*, 529 U.S. [362], 412, 120 S. Ct. [1495], 1523 [(2000)].

*Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). Lastly, clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412, 120 S. Ct. at 1523.

## IV. DISCUSSION

The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one. *See Chandler v. United*

11

*States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). In order to establish

deficient performance, the petitioner must show that, in light of all the

circumstances, counsel's performance was outside the wide range of professional

competence. *See Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052,

2066 (1984). The court's review of counsel's performance should focus on "not

what is possible or what is prudent or appropriate, but only [on] what is

constitutionally compelled." *Chandler*, 218 F.3d at 1313 (quoting *Burger v.*

*Kemp*, 483 U.S. 776, 107 S. Ct. 3114, 3126 (1987)). The court's review of

counsel's performance must be highly deferential, and the court must avoid

second-guessing counsel's performance. *See Strickland*, 466 U.S. at 689, 104 S.

Ct. at 2065. For a petitioner to show deficient performance, he "must establish

that no competent counsel would have taken the action that his counsel did take."

*Id.*

Lastly, there are no absolute rules dictating what is reasonable performance

because absolute rules would restrict the wide latitude counsel have in making

tactical decisions. *See id.* at 1317. "As such, at a sentencing proceeding, counsel

is not required to present all mitigation evidence, even if additional mitigation

evidence would have been compatible with counsel's strategy." *Putman*, 268 F.3d

at 1244. "Counsel's complete failure to present mitigation evidence does not

12

necessarily constitute deficient performance, even if mitigation evidence is available." *Id.*

In light of these precepts, we will consider each of Osborne's claims of ineffective assistance of counsel, but first we will delineate the claims on which the district court granted the COA. The district court granted the COA on numerous claims under the heading of "Whether trial counsel rendered ineffective assistance by failing to conduct a full independent investigation of the circumstances underlying the guilt phase of Petitioner's trial." (Federal Record, Vol. 4-39.) The specific claims Osborne raised in his original habeas petition, and the claims on which the district court granted the COA are as follows: Claim I, alleging that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); Claim IV(b), alleging that his attorney was ineffective for failing to present exculpatory material; Claim IV(e), alleging that his attorney was ineffective for failing to discover that the State was withholding exculpatory material; Claim IV(l), asserting that his attorney failed to discover and present evidence of numerous witnesses to corroborate that the victims told people on the day of the crime that they would get their money "or else;" Claim IV(s), asserting that his attorney failed to interview state experts prior to trial; Claim IV(u), asserting that his attorney failed to present defense experts; Claim IV(aa),

13

asserting that his attorney failed to adequately confront the State's case at the guilt/innocence phase of the trial; Claim IV(ff), asserting that his attorney failed to conduct an adequate pretrial investigation into Osborne's life and background to uncover and present evidence to the jury on mitigation at sentencing; and Claim XIII, asserting that his attorney was ineffective for failing to conduct an adequate investigation.

The evidence forming the basis for Claims I and XIII include the following: (a) police notes indicating that the victim Jones acted aggressively toward Osborne on the day of the murder; (b) photographs of drug paraphernalia found in the victims' home; (c) a police interview of one of Osborne's friends who stated that he believed Osborne was high on the day of the crime; (d) information from other sources that Osborne used crack cocaine; (e) mental health opinions that Osborne was addicted to crack cocaine and may have been suffering from cocaine hallucinosis; (f) information from Osborne's brother and Osborne's girlfriend that he had been beaten by Jones on the day of the crime; (g) the expert opinions of the State's crime scene reconstruction and ballistics experts; and (h) opinions of

defense experts to rebut the State's evidence. (Federal Record, at Vol. 1-22, p. 28; Vol. 4-39.)[1]

A.  Guilt and Penalty Phase Claims of Ineffective Assistance of Counsel

1.  Guilt Phase Claims

a.  *Brady* claim

Initially, we must dispose of Osborne's assertion that his substantive *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), claim is properly before this court for review. Although the district court's order granting a COA mentioned Claim I, which Osborne listed in his petition as a substantive *Brady* claim, it was not listed as a stand alone claim in the COA. Instead, the district court mentioned Claim I within an enumerated list of other claims of ineffective assistance of counsel. The district court noted that "[w]hile portions of claim[] One . . .are also subject to a procedural default, the Court determines that th[i]s claim[] cannot be dismissed in [its] entirety based upon Petitioner's allegations of ineffective assistance of counsel." (Federal Record, at Vol. 1-9, p. 14.) In a subsequent

---

[1]Although the district court noted that Claim XIII asserted claims of ineffective assistance for failure to conduct an adequate investigation, a review of Osborne's habeas petition reveals that Claim XIII is actually a claim regarding his attorney's failure to present mental health evidence. However, Claim I encompasses a claim regarding counsel's failure to present mental health evidence. It appears that the district court combined these two issues for convenience.

order, the district court briefly discussed the substantive *Brady* claim in the context of an ineffective assistance of counsel claim. (*Id.* at Vol. 3-22, p. 30-31.)

There is no mention of a substantive *Brady* claim in Osborne's brief on direct appeal of his convictions and sentence. Osborne did raise a *Brady* claim in his state habeas petition under the heading enumerated Claim II: "Misconduct by the prosecution team deprived petitioner of his constitutional rights to due process and a fair trial, in violation of Art. I, § 1, ¶¶ 1, 2, 11, 12, 14 & 17 of the Constitution of the State of Georgia and the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." (State Record, Exh. 8, Respondent's Exh. 22, p. 8-9.) As factual support, Osborne claims that the prosecution team withheld exculpatory material in violation of *Brady*. In his amended state habeas petition, Osborne listed the *Brady* claim within Claim IX: "Curtis Osborne was denied an adversarial testing when critical, exculpatory evidence was not presented to the jury during the guilt/innocence and the penalty phases of his trial, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Georgia Constitution." (State Record, Exh. 8, Respondent's Exh. 24, p. 31.) This exact claim became Claim I of Osborne's Post-Hearing Memorandum filed with the state trial court. (State Record, Exh. 12, Respondent's Exh. 30, p. 28.) In its

16

order denying Osborne habeas relief, the state trial court found this claim to be procedurally defaulted because it was not raised at trial or on appeal. (State Record, Exh. 13, Respondent's Exh. 32, p. 6.) Accordingly, we conclude that the substantive *Brady* claim is not properly before us for federal review because the last state court rendering judgment found the claim to be procedurally defaulted, and Osborne fails to demonstrate cause and prejudice to excuse the default. *See Harris v. Reed*, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989).[2]

As far as Osborne's claim of ineffectiveness based on *Brady*, the district court correctly found that the state court's analysis of the claim was not contrary to clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. There is not a reasonable probability that had this evidence (photographs, police reports, and alleged evidence that Osborne was high on crack cocaine at the time of the murders) been disclosed to the defense, the result of the proceeding would have been different. *See United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985) (recognizing that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression

---

[2] We also note that Osborne requested that we expand the COA to include a substantive *Brady* claim in case this court found that the claim was erroneously omitted from the COA. We declined his request.

17

undermines confidence in the outcome of the trial"). As the state habeas court correctly found, the photographs were accidentally placed in Osborne's file and were irrelevant. Also, the state court correctly opined that the police notes were not exculpatory and were cumulative.

The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. As the district court noted, Osborne cannot meet the materiality standard for his *Brady* claim, thus he cannot show the requisite prejudice under *Strickland* to support his claim of ineffective assistance of counsel based on *Brady*. *See Crawford v. Head*, 311 F.3d 1288, 1327 (11th Cir. 2002) (noting that this court and the Supreme Court "have conflated to a large extent the prejudice inquiry with the materiality standard required to obtain relief under *Brady*"). Accordingly, Osborne is not entitled to relief on this claim of ineffective assistance of counsel.

b. Ballistics expert

Osborne argues that his trial counsel, Johnny Mostiler ("Mostiler"), was ineffective for failing to obtain the assistance of an expert who could refute the State's ballistics evidence. Osborne notes the fact that the State presented the testimony of a ballistics expert who testified that the markings on the bullets

18

recovered from the body of Jones indicated that they were fired from a Ruger, single action .357 pistol. Osborne contends that the significance of this testimony is self-evident: a single action revolver requires that the firing pin be "cocked" before each shot. Thus, this testimony was critical to the State's rebuttal of Osborne's defense that he reflexively shot Seaborne.

In the state habeas proceedings, Osborne presented the testimony of George Stanley ("Stanley"), who was qualified as an expert forensic firearm and toolmark examiner. Stanley testified that the State expert's opinion that the bullets could only have come from a single action Ruger was incorrect. Stanley testified that, based on the markings found on the bullets taken from Jones's body, and a search of recognized databases, he found at least three other weapons that could have expelled the bullets. Each of these other weapons were double-action revolvers. Osborne asserts that this type of testimony by Stanley would have been critical to the defense, would have completely undermined a crucial aspect of the State's case, and would have meshed with his theory of defense.

In rejecting this claim, the state habeas court acknowledged testimony by Mostiler that he did not feel that a ballistics expert would have been helpful to Osborne's defense because "[Osborne] had spent an hour and a half with the Sheriff showing him exactly how he shot [Jones] in the back of the head and

19

[Seaborne], in the car, telling him the entire story. At that point, to me, it did not appear crucial as to where that gun came from or where the gun in fact was. [Osborne] had admitted that he had shot the victims, and we were having to deal with his confession." (State Record, Exh. 13, Respondent's Exh. 32, p. 61; Exh. 9, Respondent's Exh. 25, p. 145.) The trial court further noted that Mostiler testified that "[Osborne] had admitted to the killing, he admitted to shooting Arthur Jones in the back of the head and Lisa Seaborne as she turned toward him, so we did not find any expert testimony that, if it were challenged, would assist us any further in the case, that I saw." (*Id.*) Thus, the trial court concluded that Osborne's trial counsel's decision not to call experts to challenge the State's ballistics testimony was reasonable under the circumstances and did not support a claim of ineffective assistance of counsel.

The federal habeas court analyzed the claim as follows:

In regards to the ballistics expert, Petitioner asserts that such would be helpful to show that the weapon used was a double action revolver as opposed to a single action revolver. The significance of this, according to Petitioner, is that it would rebut the State's argument that Petitioner acted with premeditation because he had to manually cock the weapon before firing a second shot. In support of this Petitioner points to the affidavit of Mr. George Stanley, a forensic firearms examiner, who examined the trial testimony of the State's ballistics expert, Mr. Kelley Fite. Stanley asserts that given the testimony, he believes three other revolvers, all of which are double

20

action, could have been used by Petitioner as opposed to a Ruger single-action .357 revolver.

(Federal Record, Vol. 3-22, pp. 34-38.) The district court rejected the claim by finding that the state court's disposition of the claim was a reasonable application of *Strickland*.

> The State habeas court found that "Petitioner's attorney's decision not to call experts in support of Petitioner's defense, was reasonable under the totality of the circumstances and does not support a claim of ineffective assistance of counsel." This finding is based on the fact that Mostiler testified that he did not feel a ballistics expert was necessary because Petitioner had confessed to shooting the victims, making the type of gun used somewhat irrelevant and that he did not feel expert testimony was needed to support Petitioner's defense contained in his confession. Again, the Court cannot say that the State court unreasonably applied the controlling authority to the facts.

(*Id.* at 38-39.) Having found that the state trial court had reasonably found no deficient performance by trial counsel with regard to lack of a ballistics expert, the district court examined whether Osborne had shown prejudice.

> In regards to a ballistics expert, Mostiler's belief that the type of weapon used was not a significant issue because Petitioner plainly admitted to shooting the victims is reasonable and cannot be considered deficient performance. Even if it were considered deficient, there is no prejudice because even if the weapon did not have to be cocked before firing the second shot, it is highly unlikely that this evidence would be of such significance as to change the outcome of the trial, or in other words, to negate the Jury's finding of premeditation.

21

(*Id.*)  Based on our review of the record, we conclude that the district court correctly found that the state court's resolution of this issue was reasonable. Accordingly, Osborne is not entitled to relief on this claim of ineffective assistance of counsel.

c.  Crime scene reconstruction expert

Osborne takes issue with his trial counsel's failure to challenge the State's crime scene reconstruction expert.  Osborne notes that a key aspect of the State's case was that Osborne's story that he killed the victims because he believed Jones was reaching for a weapon to either beat him or kill him was not true due to the positioning of the victims' bodies.  According to Osborne's account, the victims should have been bending over.  The State, however, obtained the assistance of an expert who testified that the victims were sitting upright when the perpetrator shot them.  The expert even opined that when the perpetrator shot Seaborne, he was holding up her head.  Osborne argues that his trial counsel should have spoken with the State's expert about his testimony so that trial counsel could have filed a motion seeking production of the expert's report in order to make a reasoned determination whether to obtain the assistance of an expert in this area.

The federal district court concluded that the state trial court's finding that Mostiler was not ineffective for failing to obtain a crime scene reconstruction expert was a reasonable application of *Strickland*.

> Lastly, as to the crime scene reconstruction expert it is not clear exactly what Petitioner believes such an expert could show as Petitioner asserts only that a crime scene reconstruction expert could rebut the Government's case and support Petitioner's version of the facts. Because much of the evidence at trial presented by the Government involved the position of the victims' bodies before being shot (i.e. whether they were upright or leaning over as asserted by Petitioner's confession), it is assumed by the Court that this is the evidence to which Petitioner is referring. The overwhelming evidence offered at trial was that the victims were seated in an upright position when shot. Petitioner's belief that a crime scene reconstruction expert could rebut this in some way is speculative. Petitioner presents the Court with no evidence supporting the contention that the evidence may indicate that the victims were reaching down.

(Federal Record, Vol. 3-22, pp. 39-40.) The federal district court also reviewed the state court's finding in light of the evidence and trial counsel's testimony and concluded:

> Both Mostiler and his investigator, a former police investigator, reviewed the crime scene photographs as well as the car where the crime took place and chose not to obtain any experts. As Mostiler testified "we did not find any expert testimony that, if challenged, would assist us further in the case." If Mostiler believed, after his investigation, that a crime scene reconstruction expert could have shown that the victims were in a position other than upright when shot, it stands [to] reason[] that he would have hired one as the Court granted him funds to do so.

23

(*Id.* at 40-41.)

The district court's resolution of this claim was proper. The hiring of a crime scene reconstruction expert was not consistent with trial counsel's chosen defense, made necessary by the content of Osborne's confession. The state court reasonably applied *Strickland* in finding that the defense did not actively contest the State's experts because Osborne had already admitted killing the victims, and his statement contained inherent defenses to the shootings, such as self-defense and voluntary manslaughter. The fact that present counsel might have chosen to try to undermine the State's experts with defense experts does not render trial counsel ineffective or unreasonable in attempting to support his chosen defenses of self-defense or voluntary manslaughter as trial defenses, based on Osborne's own statements. Thus, without proof from Osborne as to what good a rebuttal crime scene reconstruction expert would be, the federal district court properly deferred to the State trial court's finding of fact and concluded that the State court's resolution of the claim under *Strickland* was reasonable.

2. Penalty Phase Claim

Osborne contends that his trial counsel was ineffective for failing to conduct a reasonable investigation into his background to discover mitigating evidence to present at the penalty phase of his trial. Osborne challenges his trial counsel's

24

failure to present evidence of his drug use, his mental health condition, and evidence from mental health experts. Osborne presents the affidavit of James Larson, Ph.D., who opines that Osborne suffers from Major Depressive Disorder and Post Traumatic Stress Disorder. Osborne claims that his trial counsel could have obtained the assistance of an independent mental health expert who could have testified to these diagnoses. The expert's testimony would have been relevant to a defense of voluntary manslaughter because when Osborne saw Jones make a move, it triggered Osborne's trauma recollection and caused him to react by shooting Jones to abate the perceived threat. Osborne also asserts that there was evidence of drug use and possible cocaine hallucinosis that trial counsel failed to present at sentencing. Osborne argues that the state courts' resolution of this claim of ineffective assistance of counsel was both contrary to clearly established law and an unreasonable application of clearly established Supreme Court precedent.

The state court concluded that the facts of the case did not warrant a finding of unreasonableness by Mostiler. The court noted that Mostiler extensively investigated the case, knew Osborne's history, and presented many of the same witnesses that Osborne's present attorney presented in the form of affidavits. In fact, the trial court commented that Mostiler presented nine witnesses at the

penalty phase of Osborne's trial. The trial court then detailed the mitigating

evidence that Mostiler presented at the sentencing phase of trial.

> The witnesses presented on behalf of Petitioner at trial included his former employer Howard Drawdy. Mr. Drawdy testified that Petitioner worked for him for approximately six years and that he had always been a hard worker and that he had never known Petitioner to have a propensity for violence. Mr. Drawdy also testified, "Curtis was real close to his mother. In fact, he helped support his mother for as long as I've known him." Ronnie Higgins testified on Petitioner's behalf at the sentencing phase that he had known Petitioner for approximately 12 years. Mr. Higgins ran a pharmacy and had seen Petitioner come into the pharmacy to obtain[] medicine for []his mother. Mr. Higgins described Petitioner as a"very polite young man."

> Mr. Higgins also testified that he had never had any problems from Petitioner and that Mr. Higgins had taken up time with Petitioner's family after Petitioner's father died in 1980. Mr. Higgins also testified that he had never known Petitioner to display a violent temper or have a violent nature whatsoever. Mr. Higgins also testified that he often saw Petitioner with his mother.

> Petitioner's step-father, Johnny Dennis, also testified at the sentencing phase on behalf of Petitioner. Mr. Dennis testified:

>> Curtis has been a working child ever since he was thirteen years old and he was a provider. He helped me and his mother on certain bills, around the house, or whatever needed to be done. Curtis is not a bad child. He – although I was his step-father, he always listened to what I had to say. He never have been a child that talked back or anything . . . . and I feel like Curtis is my son, not no step-son.

26

Mr. Dennis also testified that he was never aware that Petitioner sold cocaine.

Petitioner's sister, Virginia Osborne, testified that over the years they had had a "fine" brother-sister relationship. Ms. Osborne testified that Petitioner was "always there for me when I needed him. He was there for everybody who needed him." Ms. Osborne also testified that Petitioner used the money he earned "quite wisely," and that Petitioner would "take care of his girlfriend, he would take care of my mother, do house things." Ms. Osborne testified that Petitioner supported his niece and nephew and the family and that the family looked to Petitioner for financial support.

Ms. Osborne testified that she recognized the hurt that the victims' families were suffering, but she stated that she saw no reason to take Petitioner's life because of a mistake he had made. Ms. Osborne stated:

> Everybody deserves a chance, and he's here. Why take his life? He's someone. He's special to the family, and I'm sure the other peoples was very special to their families, but if something happened to him I have to look back. My father's gone and my mother's all I have. And if something was to happen to my brother, I imagine it would kill my mother, and my mother can't take all of this and neither can I.

Ms. Osborne testified that she knew that Petitioner should be punished for what he had done, but that that was not the type of man he was. Ms. Osborne testified, "I feel as though he's went through an awful lot already. I mean he's young, but that don't have any excuse to what he done."

Petitioner's girlfriend, Tammy Thompson, testified at the sentencing phase on Petitioner's behalf. She testified that Petitioner had been her boyfriend for three years and was the father of her child. M[s]. Thompson testified that she found Petitioner to be a

27

"outstanding person" and that she never knew him to do anything wrong. In fact, Ms. Thompson testified that Petitioner, "always told me not to do things wrong. I find that he was a very nice person. I never knowed him to be any – violent or anything. He was a very dependable person." Ms. Thompson testified that Petitioner not only helped to support his own family, he supported her family as well.

Verlanda Elliott was also called to testify on Petitioner's behalf at the sentencing phase. Ms. Elliott testified that she had known Petitioner all of her life and that he was a very nice person, she had never known him to be in trouble and had never heard that he was selling cocaine. When she first knew Petitioner, she lived across the street from him and she testified that he had a great relationship with his family and that he "did a whole lot for his family."

Petitioner also testified in his own behalf at the sentencing phase. Petitioner acknowledged that he had been convicted of the charges, but he apologized to the families of the victims. Although acknowledging that he ought to be punished for the charges for which he had been found guilty, he asked the jury to have mercy and not to sentence him to death. Petitioner testified, "There were certain circumstances that took place that night, and sometimes things happen out of emotion and not just deliberation. Just things sometimes happen in certain ways. I want to say I'm sorry and I just ask you people to have mercy upon me."

Reverend Walter C. James testified in support of Petitioner at the sentencing phase that he had known Petitioner for approximately eight years and that he had never known him to be a violent person, even though Petitioner's yard [and] the witness's were adjacent to each other.

(State Record, Exh. 13, Respondent's Exh. 32, p. 75-79.)

The trial court also noted trial counsel's arguments at the penalty phase.

28

During closing argument on behalf of Petitioner at the sentencing phase, Mr. Mostiler argued that Petitioner had turned himself in and told the Sheriff what happened. Mr. Mostiler also argued that it was not reasonable to lure someone to a place where they could be murdered for $400.00. Mr. Mostiler argued that you might get into an argument over $400.00, and then get mad and someone kills someone, "but you don't invite them over, get in the back of the car, drive them to a motel, drive around some more, and then all of a sudden decide to execute them with no fuss, no argument, no provocation, no nothing." Mr. Mostiler also argued that it was not reasonable to think that if someone were deliberately planning to execute two people they would get in the back seat of a two-door car.

In countering the state's evidence that this was an execution style murder, Mr. Mostiler argued, "This was not an execution. This was the result of an altercation."

Mr. Mostiler argued that Petitioner had not acted "deliberately." Mr. Mostiler argued that Petitioner did not shoot the victims "after deliberation," he "did it out of fear." Mr. Mostiler also argued to the jury that the only facts that the state had proven in the case to point to the guilt of Petitioner was what Petitioner had said in his own testimony. Mr. Mostiler argued, "This case was solved because Curtis Osborne had to speak and tell what happened." Mr. Mostiler also argued that the state wanted the jury to believe that if Petitioner did not get the death penalty, he was not going to be punished, but that that was not true. Mr. Mostiler argued that Petitioner was remorseful about what had happened. Mr. Mostiler argued, "Do we want justice or do we want vengeance?"

Significantly, Mr. Mostiler argued that in the state's case in aggravation, "Not one piece of evidence did they bring out to you in aggravation of sentencing, not one act of violence." Mr. Mostiler argued, "He has no history of violence in his past." As to any history of breaking the law, Mr. Mostiler argued that the state had not brought forth that Petitioner had sold cocaine, instead, Petitioner

29

came forward and admitted it. Mr. Mostiler argued that Petitioner's "act was not an act that was committed after deliberation and reflection. It was an act that was born out of a circumstance."

(*Id.* at p. 79-80.)

The trial court further noted that, of the affidavits Osborne submitted at the evidentiary hearing in support of his claim that his trial counsel failed to present available mitigating evidence at sentencing, four were from persons who actually testified at the sentencing phase. The trial court then summarized the mitigating evidence from the other affidavits Osborne submitted. The trial court found that these affidavits added little to the mitigating evidence that was presented on Osborne's behalf at sentencing. In many instances, the trial court noted, the affidavits were simply a reiteration or an amplification of the family history presented to the jury through the nine witnesses who testified during the sentencing phase. The trial court commented that Mostiler testified that the witnesses he produced at the sentencing phase were those witnesses who were supplied to him by Osborne and his mother. The trial court then concluded that Osborne's "other mitigation" evidence was insufficient to support a finding of ineffectiveness of counsel.

With regard to Osborne's alleged drug use, the trial court stated that Mostiler testified that:

Curtis – he told me the cocaine was for sale and that he didn't use it. I didn't make a major issue of it because I saw no evidence of drug use on Curtis' part. I mean, there was nothing that – he didn't appear – the clients I have that use drugs that are in jail are usually strung out, at least to some degree and so forth, but Curtis was always very calm, and I never saw any reason to ask him about any drug use.

It appeared to me, I would say from my experience, that drugs were not a major part of Curtis' life. That is what I would have said at the time, except for the selling and the money. Curtis was interested in the money that drugs could bring in. Curtis was the bread-winner in his family. We interviewed employers, we interviewed friends, and nobody ever told us that Curtis used drugs. He did drink beer. He admitted to drinking beer.

Petitioner's mother also never told Mr. Mostiler that Petitioner used drugs.

(*Id.* at p. 85-86.)

Based on this testimony, the state habeas court found that Osborne did not show that his trial counsel was ineffective in failing to present this evidence "when counsel had no evidence before him to support any such assertions and Petitioner never informed his attorney of any alleged drug use on his part." (*Id.* at 86.) The state habeas court concluded that Osborne's trial counsel could not be deemed ineffective for failing to present a potential type of mitigation based on drug use when Osborne himself denied any drug use to his trial attorney. (*Id.*) Moreover, Mostiler testified that his investigation revealed no evidence of any previous mental illness on the part of Osborne. Mostiler testified that Osborne cooperated

with him, was intelligent, and knew what was happening. Mostiler stated that he

investigated Osborne's possible use of crack cocaine on the night of the crime and

found no evidence that Osborne or the victims had used cocaine on that day.

Furthermore, Mostiler stated that he reviewed the report of state psychiatrist Dr.

Donald Grigsby and discussed the report with Dr. Grigsby over the phone. (*Id.* at

Exh. 9, Respondent's Exh. 25, p. 161, 164-65, 195, 204.)

The state habeas court then concluded:

> Because [Mostiler] had no evidence of cocaine usage on the
> part of Petitioner at the time of trial, despite a reasonable
> investigation of the role drugs might have played in Petitioner's
> mental state, the crimes, and/or in mitigation, Petitioner's counsel was
> not unreasonable in [not] attempting to support a defense of "cocaine
> hallucinosis." Petitioner's trial counsel also had no evidence with
> which to substantiate a request that any mental health expert be
> appointed to assist him in the defense, as Petitioner was at all times
> competent. Therefore, this Court finds that counsel was not
> ineffective for not presenting a mental health evaluation at the time of
> the sentencing phase.

(*Id.* at Exh. 13, Respondent's Exh. 32, p. 91-92.)

The district court correctly concluded that the state habeas court had

reasonably applied *Strickland* and that Osborne failed to establish that the state

court's rejection of this claim of ineffectiveness was contrary to, or an

unreasonable application of, *Strickland*. As the record reveals and the state habeas

court found, Mostiler had talked with Osborne and his family, knew Osborne's

32

background, observed Osborne during their interactions, read Dr. Grigsby's report, and discussed the report with Dr. Grigsby. Mostiler had no evidence to substantiate a request that any mental health expert be appointed to assist him in the defense because Osborne appeared competent, cooperative, and intelligent. Under these circumstances, Mostiler's failure to present this alleged mitigation evidence was not deficient performance. Accordingly, Osborne is not entitled to relief on this claim.

B. Ineffective Assistance of Counsel Based on Conflict of Interest

Osborne asserts that due to Mostiler's overwhelming caseload, his trial performance fell below an objective standard of reasonableness and resulted in a breakdown of the adversarial process. Basing his argument on *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, Osborne argues that he is entitled to relief based on his claim of ineffective assistance of counsel without a showing of prejudice because prejudice should be presumed in this situation.

Osborne raised this specific claim in his second state habeas corpus petition. The state court declined to address this claim because it concluded that Osborne could have raised it in his first state habeas petition. Specifically, the state habeas court found:

At the evidentiary hearing for this first habeas petition, Petitioner examined his trial counsel as to his representation of Petitioner. Petitioner knew at the time of his first petition that his trial counsel was a public defender and could have easily questioned him then about his caseload and how it affected, if at all, his representation of Petitioner. However, Petitioner did not do that and by failing to has waived his opportunity to raise that claim in this petition. Additionally, this claim is nothing more than an ineffective assistance of counsel claim couched in other language and, as such, could have reasonably been raised in his first petition and is thereby waived.

(Federal Record, Vol. 2-14, App. B, p. 3-4.)

Because the last state court rendering judgment found the claim procedurally defaulted, the claim is barred from federal review. *Harris*, 489 U.S. at 262, 109 S. Ct. at 1043; *see also White v. Singletary*, 972 F.2d 1218, 1227 (11th Cir. 1992). Accordingly, we decline to consider the merits of this claim.[3]

C. Ineffective Assistance of Counsel Based on Racial Animosity

Osborne asserts that his trial counsel labored under a racial animus toward him that deprived him of the effective assistance of counsel guaranteed by the Sixth Amendment and deprived him of the right to be free from cruel and unusual punishment in violation of the Eighth Amendment. Specifically, Osborne claims

---

[3] Even if we considered the merits of this claim, we would agree with the district court that Osborne is not entitled to relief on this claim. As the district court found, Mostiler was an experienced and effective advocate for Osborne. Osborne presented no evidence, other than vague statistics, to support his allegation that trial counsel's caseload impeded his representation. As such, Osborne cannot show that Mostiler's representation fell below an objective standard of reasonableness such that prejudice is presumed.

34

that because of his racial animosity, Mostiler did not disclose to him the State's offer of a life plea. To support his claim, Osborne presents the affidavit of Mr. Gerald Huey ("Huey"), a white client of Mostiler's. Huey recalls that he was aware of the Osborne case, but did not know Osborne until he was put in an isolation cell near Osborne. Huey states that Osborne was not in the jail for very long and the only communication they had was a verbal argument. Huey avers that one day Mostiler visited him at jail and mentioned Osborne.

> The first time I recall Mr. Mostiller (sic) saying anything about Curtis Osborne's case was when he said, "The little nigger deserves the death penalty." I was shocked because I knew that Mr. Osborne had not gone to trial yet. . . That wasn't the only time Mr. Mostiller (sic) said something like that though. I recall Mr. Mostiller (sic) telling me that I wouldn't believe the amount of money he was going to spend on my case. He said he was going to hire a private investigator and get expert witnesses. He said the money he would spend on m[e] was going to be a lot more than he would spend on Mr. Osborne because "that little nigger deserves the chair." Mr. Mostiller (sic) made similar comments to me both before and after Mr. Osborne's trial.

(Federal Record Vol. 2-14, App. A.)

We note, however, that the exact claim Osborne proffers now, that because his trial attorney harbored racial animosity toward Osborne, he failed to disclose the life plea to Osborne, was not asserted in state court until Osborne filed his second state habeas petition, which followed his federal habeas petition. In his first state habeas petition proceedings, Osborne's counsel filed a motion to amend

35

his petition to include a claim of ineffective assistance based on counsel's failure to inform Osborne of a plea agreement. The trial court reserved ruling on the motion until the habeas hearing. At the hearing, Mostiler testified that he recalled "trying to talk Curtis into accepting the plea offer from the State, which was a life sentence." (State Record, Exh. 9, p. 172-73.) Mostiler stated that he did discuss a plea offer with the District Attorney and did try to get Osborne to accept that plea. (*Id.* at 200-01.)

In his Post-Hearing Memorandum in state court, Osborne raised the claim that his attorney's failure to communicate to him the offer of a plea of life prior to his trial violated his Sixth, Eighth, and Fourteenth Amendment rights. (*Id.*, Exh. 12, Respondent's Exh. 30, p. 55.) There is no mention in the supporting portion of Osborne's brief that Mostiler did not convey the life plea because Mostiler harbored racial animosity toward Osborne.

The trial court rejected Osborne's claim that his trial counsel was ineffective for failing to convey the life plea offer to him pre-trial. The trial court credited Mostiler's testimony that Osborne did not authorize him to solicit a plea offer; that Mostiler did discuss with the District Attorney a plea offer; and that Mostiler did attempt to get Osborne to accept the plea offer. The trial court concluded that there was no evidence to support Osborne's assertion that Mostiler failed to

36

convey to him a plea of life. (State Record, Exh. 13, Respondent's Exh. 32, p. 16-17.) Accordingly, the trial court denied Osborne relief on this claim.

In Osborne's federal habeas petition, which he filed before his second state habeas petition, he raised the claim that Mostiler's racial animosity toward him affected Mostiler's representation; specifically, that because of Mostiler's racial animosity, he failed to disclose the plea offer to Osborne. The district court initially dismissed the claim because it was not exhausted. Osborne then proceeded to file a second habeas petition with the state court alleging that his trial counsel was a racist and that as a result of his racism, his representation violated Osborne's Sixth, Eighth, and Fourteenth Amendment rights. (Federal Record, Vol.2-14, App. A, p.4.) In support of his claim, Osborne presented the affidavit of Huey and alleged that Mostiler failed to convey to him pre-trial the plea offer.

The state trial court denied Osborne relief on this claim.  Noting that it was deciding all issues under O.C.G.A. § 9-14-51[4] because the petition was a second habeas petition, the trial court concluded:

> The Court takes notice of Petitioner's first habeas petition in which Petitioner asserted a claim of ineffective assistance of counsel, citing numerous alleged deficiencies.  In fact, one such deficiency was a failure to communicate a plea offer.  In its order of August 18, 1997, this Court held that the plea offer was communicated to and refused by Petitioner.  Therefore, that allegation is res judicata.  Furthermore, the affidavit of Gerald Huey, which is merely hearsay, could have been procured before or during the pendency of Petitioner's first habeas and, therefore, does not constitute new evidence.  Petitioner cites no other examples and presents no new evidence of this alleged racial bias on the part of his trial counsel.

(*Id.*, App. B, p. 2.)  Thus, the district court directed the parties to be prepared to discuss at the federal hearing whether the claim should be reinstated.

At the federal habeas hearing, the parties agreed that at that time, the claim was exhausted.  However, the State argued that the claim was procedurally barred

---

[4] This section, entitled "Effect of failure to raise grounds for relief in original or amended petition," provides:

> All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition.  Any grounds not so raised are waived unless the Constitution of the United States or of this state otherwise requires or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.

O.C.G.A. § 9-14-51 (2006).

from federal review because the state court relied on a state procedural rule in denying Osborne relief on the claim. Osborne's counsel conceded that the Sixth Amendment claim regarding counsel's failure to convey the plea agreement was barred from federal review, but maintained that Osborne's Eighth Amendment claim based on *McCleskey v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756, was properly before the federal court for review. (Federal Record, Vol. 5.)

In its order, the district court considered the two claims together because it found that the crux of the two claims was Osborne's assertion that Mostiler failed to disclose to him that the State offered him a plea of life imprisonment. The district court then invoked the AEDPA standards and presumed that the state court's findings on these claims were correct. *See* 28 U.S.C. § 2254(e)(1). The district court found that Osborne did not meet his burden of rebutting this presumption by clear and convincing evidence. The district court noted that the Huey affidavit is not clear and convincing evidence that Mostiler failed to convey the plea offer because of his racial animosity. The district court also found that the affidavit is not sufficient to rebut the State court's factual finding based on Mostiler's clear testimony that he told Osborne about the plea offer, that Osborne rejected the offer, and that Osborne never wavered from that position. Accordingly, the district court denied Osborne relief on these claims.

We agree with the district court that Osborne is not entitled to relief on these claims. First, Osborne's claim based on the Sixth Amendment is clearly barred from federal habeas review. The state trial court found the claim res judicata and even Osborne's counsel conceded such. Second, our reading of the state trial court's order on Osborne's second state habeas petition convinces us that Osborne's Eighth Amendment *McCleskey* claim is also procedurally barred from federal review. The state trial court relied upon Georgia procedural rules in denying Osborne relief on this claim. As such, the claim is barred from federal review. *See Harris*, 489 U.S. at 262, 109 S. Ct. at 1043; *see also, Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) (stating that as long as a state court explicitly invokes a state procedural bar rule as a separate basis for a decision, an alternative ruling on the merits does not preclude the federal courts from applying the state procedural bar).

Assuming *arguendo* that the *McCleskey* claim is not procedurally barred from federal habeas review, we conclude that the claim lacks merit. Even if the affidavit correctly recounts Mostiler's statements to Huey, it does not establish that Mostiler failed to convey the plea offer to Osborne. Moreover, Osborne presents no other evidence to support his claim that Mostiler's alleged racial animosity affected his representation. Furthermore, *McCleskey* discusses the

racial animus of the decisionmakers, not defense counsel; therefore, Osborne's claim does not fit within the *McCleskey* rubric. *See, e.g, Meeks v. Moore*, 216 F.3d 951, 967 (11th Cir. 2000) (noting that the "decisionmaker" in the case was either the prosecutor or the jury); *Jones v. White*, 992 F.2d 1548 (11th Cir. 1993) (noting that the "decisionmakers" in the case were the prosecutor and jurors). Accordingly, the state court's finding regarding Mostiler's alleged racial animosity is neither contrary to clearly established federal law nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Osborne is not entitled to relief on this claim.

## V. CONCLUSION

For the foregoing reasons, we affirm the district court's order denying Osborne habeas relief.

AFFIRMED.