[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 14, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-14388
Non-Argument Calendar

_____

D. C. Docket No. 05-00303-CV-3-LAC-MD

ROBERT ELLIS LOWERY,

Petitioner-Appellant,

versus

JERRY CUMMINGS,
Warden,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(November 14, 2007)

Before TJOFLAT, BIRCH and HULL, Circuit Judges.

PER CURIAM:

Robert Ellis Lowery, who is currently serving a life sentence for second-degree murder, appeals the district court's denial of his pro se 28 U.S.C. § 2254 petition in which he argued that his trial counsel was ineffective in her failure to: (1) take the necessary steps to establish a Post Traumatic Stress Disorder ("PTSD") defense; (2) call additional witnesses to testify about an eye injury allegedly incurred during his altercation with the victim; (3) request a jury instruction on the justifiable use of non-deadly force; and (4) object to the trial court's inadvertent substitution of two jurors with alternate jurors. Upon thorough review of the record, we affirm.

## I. BACKGROUND

### A. PTSD

At his trial, Lowery testified to the following: On the evening of John Tillery's death, Lowery, after calling Tillery's house several times looking for his girlfriend, Cheryl Harrelson, and being told she was no longer there, finally went there in search of her. He knocked on the screen door and heard someone tell him to enter. Upon entering, he saw no one in the living room, but heard a voice ask him what he wanted. Lowery asked whether Tillery[1] had seen his girlfriend. Tillery said no. As Lowery turned to leave, Tillery called him names and told him

---

[1]Neither party disputes that it was Tillery's voice that Lowery heard.

that Harrelson did not love Lowery anymore. Lowery replied in kind and, as he turned to leave again, heard a noise behind him that sounded as though something was being thrown at him. The next thing he knew, he was "halfway to the floor" with his left arm pinned behind his back and his right hand gripping a hand that was poking at his eye. R1-26, Exh. H, Vol. V at 838-39.

Lowery was repeatedly pulled down on top of what he eventually came to realize was a person. Tillery continued to poke his eye, and Lowery believed Tillery was trying to poke his eye out. Lowery was "just swinging out knocking [loose] the hand" that held him in an attempt to stand up. Id. at 844. At one point, as Lowery was pulled to the floor, his hand landed on something he subsequently discovered to be Tillery's face. Tillery was still gripping his pants when he heard a deep voice telling him that he was not going anywhere. Lowery looked up and saw a face covered in blood. Believing a third person had swung at him and hit Tillery instead, Lowery "figured [he had] better get on out of [t]here" and slapped the face with his hands. Id. at 848. Lowery ended up on the ground again beside Tillery, who was holding his jaw and saying, "um, um." Id. Lowery jumped up and, after ducking because he thought something was about to hit him, he left the house and drove away.

Lowery further testified that: (1) he had the impression that there was a third

3

person involved because of the blood on Tillery's face; (2) after the altercation, he hoped that he had not broken Tillery's jaw as a result of slapping or falling on him; (3) he thought that Tillery was alive when he left; (4) he had no malice or hatred towards Tillery; (5) he did not intend to kill or seriously harm Tillery; and (6) he felt that he was in danger. Lowery testified that, at the time of the altercation, he was between 5'7" and 5'8" tall, between 155 and 165 pounds, and in good physical shape.

Detective Allen Cotton, the sheriff's office investigating officer, testified to the following: He and another officer later found Lowery outside of his neighbor's house, and Lowery agreed to come down to the police station with them to discuss the incident. During the interview, Lowery's demeanor and mood were erratic. Cotton's account of Lowery's account of the fight between him and Tillery paints Lowery as more aggressive. However, the account remains consistent as to Lowery's insistence that Tillery was alive when he left the house and that Tillery struck him first. Cotton admitted that Lowery did not confesss to killing Tillery.

Outside the presence of the jury, John Bingham, Ph.D., an expert psychologist in the field of PTSD, explained to the court that a person suffering from PTSD has experienced "a very traumatic event," and that a subsequent similar event triggers a re-experience, causing the person to react disproportionately, or

4

not in "a normal fashion." R1-16, Exh. H, Vol. IV at 671, 672. This "dysfunction" causes the person to act inappropriately, make inappropriate decisions, and respond impulsively when confronted with a triggering event. Id. at 674-75.

After this proffer, the trial court ruled that, pursuant to several Florida state cases involving battered spouse syndrome ("BSS"), if Lowery intended to have an expert testify about PTSD in his case, he should have notified the state in writing and permitted the state to have him undergo a mental evaluation. Lowery's trial counsel, Katherine Snowden, admitted that, although the state was aware that Bingham's deposition had been taken regarding PTSD, she had not given formal notice to the state of a potential PTSD defense. Also, the state's request to have Lowery examined by its expert had been denied. Accordingly, the court ruled that Lowery would not be allowed to present expert opinions about himself specifically, but could still present expert testimony about PTSD generally as to a hypothetical person, provided he established a sufficient factual basis to support it. The court also determined that medical records purportedly showing previous injuries to Lowery's skull were inadmissable because they had not been disclosed to the state during discovery.

To test for a sufficient predicate to permit a PTSD defense and general PTSD expert testimony, Lowery made a proffer to the court, outside of the

presence of the jury, of the following: He was hit in the head several times with a pipe in 1982, which broke his skull and required brain surgery. He was hit in the face with a pipe in 1986, which knocked out his teeth, broke his jaw, and knocked him unconscious. Since those attacks, he has tried "to stay away from any type" of dangerous situation. Id. at 715. When he finds himself unable to flee dangerous situations, such as the altercation with Tillery, he is likely irrationally to hit someone. He attempted to get away from Tillery, but could not. After the final time Tillery pulled him down, Lowery saw blood on Tillery and "figured somebody else swung at me and hit" Tillery, so he slapped "that man" to get away. Id. at 716. At the conclusion of Lowery's proffer, the state court found that a "sufficient factual predicate ha[d] been established to support the use of expert testimony regarding [PTSD] in support of the defense of self-defense." Id. at 738.

During his testimony before the jury, however, Snowden did not ask Lowery about the pipe attacks. Accordingly, the state argued that PTSD testimony should be excluded because Lowery had failed to lay a basis before the jury. The court ruled that there had been "no factual foundation . . . presented to the trier of fact which would allow introduction of th[e] expert testimony." R1-26, Exh. H, Vol.V at 955.

B. Eye Witnesses

Lowery testified that, two days after he was arrested, a nurse had examined his eye, as had "a Dr. Timmons" and James Boyd, M.D. Id. at 915. The nurse washed out his eye, but told him that she thought he needed to see a doctor. One of the doctors told him that he needed to have x-rays taken of his eye. Cotton testified that Lowery never complained of having an eye injury during his interview at the sheriff's office, and that a photograph of Lowery's face taken the morning of the arrest did not reveal an eye injury.

Boyd, who had been working as a surgeon at the jail where Lowery was incarcerated after his arrest, testified that he had diagnosed Lowery with conjunctivitis, for which he had prescribed antibiotic eye-drops and an eye patch. He also affirmed that "almost anything" can cause conjunctivitis, and that Lowery apparently did not "have any real problems," and the injury "definitely was not severe." Id. at 966, 967. Snowden then called Winifred Carnley, a nurse at the jail's infirmary, who testified that she had not seen Lowery at the jail in the month of his arrest, and Elizabeth Broderick, another nurse at the jail's infirmary, who testified that, on the night of his arrest, Lowery had complained to her about a problem with his eye, but that she could not see anything "gross or acutely abnormal about . . . Lowery's eye." Id. at 973.

7

C. <u>Non-Deadly Force Instruction</u>

The trial court gave the jury an instruction on the justifiable use of deadly force, which read: "A person is justified in using force likely to cause death or great bodily harm if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another or the imminent commission of aggravated battery against himself or another." R1-26, Exh. H, Vol. VI at 1086-87. Snowden made no objection to the jury instructions given.

D. <u>Alternate Jurors</u>

Prior to deliberation, the trial court released two jurors, whom it understood to be the alternates. Snowden did not object. Following trial, the court advised both parties that it had inadvertently replaced two original jurors with alternates. Snowden filed a motion for mistrial and argued that, because Florida has different rules for picking regular jurors and alternate jurors, the replacement of two regular jurors with both alternates was a fundamental error. The motion was denied over Lowery's objection.

E. <u>Post-Trial Procedural Developments</u>

On direct appeal, through different counsel, Lowery made arguments related to the excluded PTSD evidence and the alternate jurors. The District Court of Appeal affirmed without discussion. Lowery filed a <u>pro</u> <u>se</u> petition for a writ of

8

habeas corpus in state court, arguing ineffective assistance of counsel in several respects. The state habeas court denied the petition and a subsequent motion for rehearing and clarification without opinion. Lowery then filed a pro se motion for state post-conviction relief, pursuant to Florida Rule of Criminal Procedure 3.850, in relevant part, attacking his counsel's failure to: (1) give notice to the state of her intent to use PTSD as a defense, to provide medical records to the state, and to lay a factual predicate for the use of expert testimony in support of his PTSD defense; (2) procure the testimony of Joseph Timmons and "Mary Johnson[-Briere]," who he claimed would have testified as to the severity of his eye injury, R1-12. Att. 1, Exh. E1 at 14-16; and (3) object to the substitution of two regular jurors with alternates. Lowery's then-appointed counsel amended the Rule 3.850 motion to include, inter alia, a claim of ineffective assistance of counsel for failure to request a non-deadly-force jury instruction.

The state post-conviction court held an evidentiary hearing on the motion at which Snowden testified to the following: She and Lowery had discussed PTSD as a possible defense, but Lowery was not interested in pursuing it. In his statement to her of the events that had transpired on the night of the Tillery's death, Lowery "painted Mr. Tillery as the aggressor and [himself] as someone who was trying to flee," which she had found to be "a little bit difficult factually," because Tillery

9

was 76, slender, had cancer, and used crack, while Lowery was healthy and physically fit. R1-12, Att. 1, Exh. E4 at 17. Lowery's statement of the events had changed often, and he had initially contended that he never hit Tillery or fell on top of him.

Snowden also testified that she had investigated Lowery's eye injury, but thought it "was a red herring" because the booking photograph did not support his claim, and he complained only that "it bothered him," not that it was painful. Id. at 22. According to Snowden, there was also confusion as to whether Lowery had a preexisting eye injury. Snowden testified that she spoke on the telephone with: (1) Timmons, who did not have time to be deposed, but who wrote her a letter stating that Lowery had conjunctivitis; and (2) a nurse, named either Wilson or Johnson,[2] who had no recollection of treating Lowery. She stated that, in light of the booking photograph, which revealed no eye injury, she had decided that putting on another witness, who could not confirm a significant eye injury, would have diminished Lowery's credibility and added nothing to the defense. Johnson-Briere testified that she observed an injury to Lowery's right eye at the jail infirmary a couple of days after his arrival. At that time, his eye had appeared "very red and inflamed" and, when a doctor applied dye and a black light, she had seen that his eye was cut.

_____

[2]Snowden testified that she could not remember the name, and the related documents were destroyed during a hurricane. R1-12, Att. 1, Exh. E4 at 26.

Id. at 117, 119-20. Finally, Snowden testified that she did not think a non-deadly force instruction fit the facts of the case and that it would have been "a little disingenuous to talk about that use or nonuse [of deadly force] when someone has died as a result of extreme beating." Id. at 49.

The state court denied Lowery's Rule 3.850 motion for state post-conviction relief. As to the PTSD defense, the court reasoned that, even if notice had been given, the defense would not have been permitted because there was no evidence in the record to support a finding that Lowery was suffering from PTSD at the time of the altercation. More specifically, the court observed (1) that Lowery had contradicted himself in his motion by asserting, alternately, that PTSD testimony would have shown why he reacted "so aggressively" to Tillery's provocation, and that it would have demonstrated that Lowery did not use brutal force and was only trying to escape Tillery, R1-12, Att. 2, Exh. E5 at 14; and (2) that Lowery had not testified that he had reacted aggressively, "blacked out, overreacted, lost his ability to reason because of his past trauma," or relived prior events, id. at 14-15. The court concluded that Snowden's omissions had not prejudiced Lowery.

Next, the state post-conviction court found that Snowden's decision not to present additional testimony regarding the purported eye injury was tactical and reasoned in that it appeared that such testimony would have impaired Lowery's

11

credibility in light of the facts that (1) the booking photograph revealed no eye injury; (2) the examining doctor had testified that the injury was not severe; and (3) Lowery had not complained of an eye injury to Cotton, the officer who documented his injuries on the night of the incident. The court also reasoned that the evidence would, at most, have shown only that there was a violent altercation between Lowery and Tillery, not that Lowery acted in self-defense or did not cause Tillery's death.

The state court then found that, because Snowden raised the issue of the replacement of the two original jurors with alternates in a motion for mistrial/new trial, for which a hearing had been held, and because the issue had been fully litigated and raised on appeal, it was inappropriate for consideration under Rule 3.850. The court found also that Lowery failed to argue facts that would have established a reasonable probability that the originally-selected jury would have returned a different verdict in light of "the overwhelming evidence of [Lowery's] guilt." Id. at 24.

Finally, the state court found that Lowery was not entitled to relief on his claim that Snowden failed to request a non-deadly-force jury instruction because there was no reasonable probability that the jury would have acquitted Lowery or found him guilty of a lesser included offense. The state appellate court affirmed

without discussion.

Lowery filed a petition for federal habeas relief on the same grounds. The magistrate judge recommended that Lowery's § 2254 petition be denied for, inter alia, the following reasons: (1) "[A] PTSD defense would have flown in the face of petitioner's claimed innocence" and, therefore, Lowery could not show that he was prejudiced by Snowden's failure to lay the necessary predicate and that Snowden "did not cause Lowery to lose a PTSD defense because [based on the rest of his testimony before the jury] he did not have a viable PTSD defense to begin with." R1-28 at 25, 26. (2) The state court's finding that Snowden's decision not to call Johnson-Briere as a witness to Lowery's eye injury was a reasoned tactical decision and was well supported by the record. (3) Lowery had failed "to explain how a non-deadly force instruction would have helped him," and a jury finding that Lowery "used non-deadly force to kill a man would be an absurdity" and, thus, Tillery's death precluded a non-deadly-force instruction. Id. at 28. The magistrate judge further explained that the district court would not second-guess the state court's determination of state law that, if Lowery had requested a non-deadly-force instruction, it would have been denied and that this determination foreclosed Lowery's "ability to demonstrate deficient performance and prejudice." Id. at 28-29. Finally, (4) the magistrate judge found that there was no underlying structural

13

defect in the trial court's inadvertent replacement of two regular jurors with alternate jurors before deliberation and that, even if Snowden had been deficient for failing to object, and even if the error had been structural, Lowery had not demonstrated prejudice because (a) deliberations had not started when the regular jurors were inadvertently excused; (b) the alternates were qualified in the same manner as the rest of the jurors and did not know that they had been designated as alternates and, thus, would have had no reason to be less attentive during the trial; and (c) the alternates' potential bias had been fully subject to peremptory challenge and challenge for cause. As to each issue, the magistrate judge emphasized that the state court's factual findings were well-supported, objectively reasonable, and did not result in a decision contrary in unreasonable application of established federal law.

The district court adopted and incorporated the magistrate's report and recommendation, and denied Lowery's § 2254 petition and his subsequent motion for a certificate of appealability. We granted a certificate of appealability as to each of these four issues.

## II. DISCUSSION

We review a district court's denial of a § 2254 habeas petition de novo. McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005), cert. denied, 547 U.S.

14

1073, 126 S. Ct. 1828 (2006). We review the district court's factual findings for clear error, and mixed questions of law and fact de novo. Id. An ineffective assistance of counsel claim is a mixed question of law and fact that we review de novo. Id.

Under § 2254:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). A state court's decision is "contrary to . . . clearly established federal law" if it either (1) "applie[s] a rule that contradicts the governing law set forth by [the] Supreme Court," or (2) contradicts the holding of a Supreme Court case in which "materially indistinguishable facts" were presented. Id.; Osborne v. Terry, 466 F.3d 1298, 1305 (11th Cir. 2006), cert. denied, 2007 WL 1449744 (U.S. Oct. 1, 2007) (No. 06-11285). A state court's decision is "an 'unreasonable application' of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule

15

to the facts of the petitioner's case." Osborne, 466 F.3d at 1305 (citation omitted). "[A] federal habeas court may not issue the writ [under the unreasonable application clause] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams v. Taylor, 529 U.S. 362, 411, 120 S. Ct. 1495, 1522 (2000). Under the AEDPA, a state court's determinations of fact are "presumed to be correct," and the habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defence." U.S. Const. amend. VI. When a convicted defendant claims that his counsel's assistance was ineffective, "the defendant must show that [(1)] counsel's performance was deficient," and that (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

"For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence." Putman v. Head, 268 F.3d 1223, 1243 (11th Cir. 2001). "The mere fact that other witnesses might have been available or that other

16

testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Foster v. Dugger, 823 F.2d 402, 406 (11th Cir. 1987) (quotation and citation omitted). "A strategic decision by defense counsel will be held to constitute ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." See Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987) (per curiam) (quotation and citation omitted). Reviewing courts must be "highly deferential" in reviewing counsel's performance, and must utilize the "strong presumption that counsel's performance was reasonable." Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). "[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Id. at 1315.

To show prejudice, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. We have noted that, in the context of requests for federal habeas relief predicated upon ineffective assistance of counsel by state prisoners, the petitioner must not only satisfy the Strickland standard, but must also show that the state

17

court applied Strickland "in an objectively unreasonable manner." Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

A. PTSD

Lowery first argues that Snowden's failure to give notice, hand over his medical records and lay the proper predicate at trial, prejudicially deprived him of a PTSD defense. In Florida, PTSD evidence may be offered to support a claim of self-defense and "to help the jury understand why the victim would subjectively fear increased aggression against" him. State v. Mizell, 773 So.2d 618, 621 (Fla. Dist. Ct. App. 2000).

Although it is true that Snowden failed properly to lay the groundwork for a PTSD defense, the state post-conviction court found the testimony Lowery did give at trial to be inconsistent with a PTSD defense because Lowery maintained throughout his testimony that "he accidentally fell on [Tillery] one or two times" and merely slapped him a few times with open hands, not that he reacted in an overly aggressive manner. R1-12, Att. 2, Exh. E5 at 14. The court further noted that Lowery had been consistent throughout in his contention that he had used negligible force. Accordingly, the court concluded that Lowery was not prejudiced by Snowden's deficient performance because she could not have caused him to lose a PTSD defense he did not have in the first place. Because Lowery has not

18

rebutted the court's finding that his testimony was thus inconsistent by clear and

convincing evidence, it is presumed correct.[3]  See 28 U.S.C. § 2254(e)(1).  In light

of our own review of the record, neither we do not find it to be an unreasonable

determination.  Because Lowery's trial testimony actually conflicted with a PTSD

defense, the state court's conclusion that Lowery suffered no prejudice, and thus no

ineffective assistance of counsel, is not an unreasonable application of clearly

established federal law.  See Strickland, 466 U.S. at 687, 104 S. Ct. 2064, 2068.

Accordingly the district court correctly denied Lowery relief as to the issue of a

PTSD defense.

B.  Eye Witnesses

Lowery argues that the state and district courts misrepresented the record as

establishing that the testimony of the two witnesses would have been "additional"

or "cumulative," thereby leading the courts to overlook the "actual implications" of

Snowden's strategy.  Appellant's Br. at 28.  He contends that Snowden failed

reasonably to investigate the severity of his eye injury and consequently called the

wrong witnesses at trial.  Lowery particularly challenges her decision not to call

either Timmons or Johnson-Briere, both of whom actually treated his eye injury

---

[3]In addressing this issue, Lowery insists that "PTSD evidence was needed to show why he believed his actions were necessary to defend himself."  Appellant's Br. at 27.  But he does not specify the actions to which he refers or explain specifically how those actions are consistent with PTSD.  Thus, we are left with nothing more than conclusory allegations.

immediately after he was arrested.

The state court determined, based on Snowden's testimony at the evidentiary hearing and other evidence in the record, that Snowden had appropriately investigated the eye injury prior to trial. There is evidence in the record that she interviewed several treating medical personnel, and at least spoke to Timmons and to someone she believed to be Johnson-Briere, and that none of them confirmed a serious eye injury. R1-12, Att. 2, Vol. V at 935-38. The record also shows that no injury to Lowery's eye is apparent from the booking photograph taken after his arrest in connection with the fight with Tillery, and that the arresting officer was unaware of any such injury. Id., Att. 2, Vol V at 935; id., Att. 1, Exh. E4 at 634, 642. . Therefore, we find that it was not unreasonable for the state court to conclude that Snowden's strategic choice not to call more witnesses, because she believed they would have been cumulative and particularly because she believed they might diminish Lowery's credibility, was not so patently unreasonable that no competent attorney would have made the same choice. See Kelly, 820 F.2d at 1176. Accordingly, the state post-conviction court's finding that Snowden's performance was not deficient was also objectively reasonable.

Even if the state post-conviction court had found Snowden's performance deficient as to this issue, it properly concluded that Lowery failed to meet his

burden in demonstrating prejudice. The state court reasoned that additional testimony from Johnson-Briere or Timmons that Lowery had an eye injury while incarcerated would have shown nothing as to the nature of the altercation, that it would not have demonstrated that he received the injury while defending himself or that he received it during the altercation with Tillery. The court thus objectively reasonably concluded that Lowery failed to satisfy his burden of demonstrating that there was a reasonable probability that presenting testimony from additional witnesses would have altered the outcome of the trial. Accordingly, we find that the state court's finding that Lowery was not prejudiced by Snowden's failure to call additional witnesses to testify about the severity of Lowery's eye injury and so had no claim for ineffective assistance of counsel was not contrary to, or an unreasonable application of clearly established federal law, and that the district court properly denied Lowery relief as to this issue.[4]

C. Non-Deadly Force Instruction

Lowery argues that Snowden's testimony at the evidentiary hearing about why she did not ask for a non-deadly force instruction was based on hindsight and

---

[4]The district court did not specifically address Snowden's failure to call Timmons. However, because Timmons conducted the examination of Lowery's eye about which Johnson-Briere testified, and his testimony presumably would have been the same as hers, our analysis would be the same for Timmons. Accordingly, the district court's failure to address the issue of Timmons does not alter this conclusion.

conflicted with the trial transcript, which revealed that she did not present a defense based on, or evidence of, the justifiable use of deadly force. He notes that the non-deadly-force instruction explicitly provides that it can be given when the victim has died. Without the instruction on non-deadly force, Lowery contends that "the jury was left with absolutely no alternatives." Appellant's Br. at 47. He asserts that it would have been "far easier" to convince the jury that he faced "the imminent use of unlawful force," as per in the non-deadly-force instruction. Id. at 48.

In Florida, "[i]t is well settled law that the defense is entitled to jury instructions on his theory of defense if evidence has been introduced to support those instructions." Cooper v. State, 573 So.2d 74, 76 (Fla. Dist. Ct. App. 1990) (per curiam). "The trial court should not weigh the evidence for the purpose of determining whether the instruction is appropriate." Garramone v. State, 636 So.2d 869, 870 (Fla. Dist. Ct. App. 1994). Where a firearm is discharged and the victim dies, deadly force is used as a matter of law, and a defendant is not entitled to a jury instruction on the justifiable use of non-deadly force. Miller v. State, 613 So.2d 530, 531 (Fla. Dist. Ct. App. 1993) (per curiam). On the other hand, Florida courts have held that, generally, where the defendant claims self-defense, the question of what type of force was used is a question for the jury. See Garramone,

636 So.2d at 871 (holding that, where an attacker was thrown off a bridge into water and drowned, the jury should have been instructed on the justifiable use of non-deadly force). See also Howard v. State, 698 So.2d 923, 925 (Fla. Dist. Ct. App. 1997) (holding that, where defendant testified that the victim was stabbed when he lunged at her, jury should have been instructed on the justifiable use of deadly and non-deadly force).

While the state post-conviction court did not explicitly apply Strickland to determine whether Snowden was ineffective for failing to request a non-deadly-force jury instruction, it stated that, had the instruction been given, "there is still no reasonable probability that the jury would have acquitted [Lowery], or found him guilty of a lesser included offense." R1-12, Att. 2, Exh. E5 at 31. The court based its decision on the finding that Lowery's "contention that he merely slapped the victim with an open hand is wholly incredible, and no reasonable juror could believe such a claim." Id. Thus, the state post-conviction court appears to have assumed that Snowden's performance was deficient for failing to request a non-deadly-force instruction, but determined that Lowery was not prejudiced by this deficiency because counsel's failure to request the instruction did not change the outcome of Lowery's trial.[5] We find this was not an unreasonable conclusion in

---

[5]Lowery's contention that the deadly-force instruction was inconsistent with the force he testified to Tillery having used is also meritless because the instruction as given stated that

23

light of the evidence presented, including: (1) evidence of the nature and extent of Tillery's injuries, R1-26, Exh. H, Vol. II at 307-14; (2) testimony that Tillery died of blunt force trauma, id., Vol. III at 444; and (3) evidence of extensive blood spatter, id., Vol. II at 272-76; see § 2254(d)(2), (e)(1). Accordingly, the state post-conviction court's conclusion was not contrary to, or an unreasonable application of Strickland. As such, the district court was correct to deny Lowery's petition as to that issue.[6]

D. Alternate Jurors

Lowery argues that the inadvertent substitution of jurors was a structural

---

deadly force is justified to prevent "great bodily harm . . . or the imminent commission of aggravated battery," and Lowery testified that Tillery was trying to gouge out his eye. See R1-12, Att. 1, Exh. A at 18; R1-26, Exh. H, Vol. V at 839-41. Florida law provides that "[a] person commits aggravated battery who . . . [i]ntentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement." Fla. Stat. § 784.045.

[6]We observe that the district court did err in that it found that an instruction on the justifiable use of non-deadly force could not have been given because the victim died from the beating, and that the state post-conviction court based its decision on this conclusion. This finding misstated the state post-conviction court's conclusion and was contrary to Florida law at the time of Lowery's trial. See Cooper, 573 So.2d at 76 (whether force is deadly is a jury question); Garramone, 636 So.2d at 870-71 (death of victim does not necessarily dictate deadly force instruction as opposed to non-deadly force instruction). In any event, under § 2254(d), deference is given to the state court's adjudication of the claim, which was that Lowery was not prejudiced by any deficient performance by his counsel because, in light of the overwhelming evidence that deadly force was used, the outcome of the proceeding would not have been different had the instruction been given. Accordingly, the district court's apparent error is of no consequence. See Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir. 1992) (We "may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court.").

24

error, requiring a presumption of prejudice. We have recognized that, with three exceptions not applicable in the instant case, prejudice is not presumed but must be shown in order to establish ineffective assistance of counsel based on failure to challenge structural error. See Purvis v. Crosby, 451 F.3d 734, 740-43 (11th Cir.), cert. denied, __ U.S. __, 127 S. Ct. 587 (2006). In Florida, "[s]eldom, if ever, will excusal of a juror constitute reversible error for the parties are not entitled to have any particular jurors serve. They are entitled only to have qualified jurors." Piccott v. State, 116 So. 2d 626, 627 (Fla. 1960). The Supreme Court has held that, "[a]lthough a defendant has no right to a petit jury composed in whole or in part of persons of [the defendant's] own race, he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." Powers v. Ohio, 499 U.S. 400, 404, 111 S.Ct. 1364, 1367 (1991) (quotation and citation omitted) (second alteration in original).

In Florida, a qualified juror is a male or female who is at least 18 years old, is a United States citizen, is a legal resident of Florida and the county of the place of the trial, and possesses appropriate identification or has executed a substitute affidavit. Fla. Stat. § 40.01 (2006). "The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." Busby

v. State, 894 So.2d 88, 95 (Fla. 2004) (per curiam), cert. denied, 545 U.S. 1150, 125 S. Ct. 2976 (2005).

Even assuming Snowden's performance was deficient, Lowery must still demonstrate prejudice resulting from her failure to object to the alleged structural error. See Purvis, 451 F.3d at 743. Lowery argues that he was prejudiced because Snowden ignored his objection to one of the alternate jurors, and the other alternate was black, which could have somehow altered the jury dynamics. Both allegations are speculative and conclusory, and Lowery has not pointed to any specific evidence that the alternate jurors were unqualified or not competent to serve.[7] See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (noting that a petitioner is not even entitled to an evidentiary hearing as to federal habeas corpus relief when the "claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible") (quotations and citation omitted).

For Lowery's trial, the alternates were qualified in the same manner as the rest of the jurors. Because the alternate jurors were qualified and Lowery has made

---

[7]To the extent that Lowery argues that the black alternate should not have been chosen, striking a juror on the basis of race would have been improper and likely subject to a challenge under Batson v. Kentucky, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986) (forbidding the use of peremptory challenges to jurors by the government based "solely on account of their race or on the assumption that black jurors as a group will be unable impartially" to deliberate).

26

only conclusory allegations regarding how they might have affected deliberation of his case, he has failed to show that there is a reasonable probability that the outcome of his trial would have been different had Snowden objected to the substitution of two regular jurors with alternates prior to deliberation. Accordingly, the state court's finding that he suffered no prejudice, and thus no ineffective assistance, was not contrary to, or an unreasonable application of clearly established federal law and the district court was right to deny his petition as to this issue.

### III. CONCLUSION

Lowery appeals the district court's denial of his pro se 28 U.S.C. § 2254 petition based on ineffective assistance of counsel with respect to (1) the presentation of a PTSD defense, (2) the introduction of evidence of an eye injury, (3) a jury instruction on the use of non-deadly force, and (4) the replacement of regular jurors by alternates. Because none of the state post-conviction court's rulings as to these four issues were contrary to, or in unreasonable application of clearly established federal law, the district court properly denied Lowery's § 2254 petition. We AFFIRM.

27